# EXHIBIT B

## 7. The U.S.S.G.'s Unfair Calculation for Methamphetamine

### 7.1 The Guideline Offense Calculation for Methamphetamine Lacks Empirical Data and Study

The guideline calculation for 426 grams of methamphetamine (actual) sets the base offense level at 32. If the drug was cocaine, 426 grams of cocaine is an offense level 22. Empirical data and supporting studies do not support this 10-level difference.

Under 21 U.S.C. § 841, the maximum penalty for a mere 50 or more grams of methamphetamine [actual] is life. After a three-level adjustment for acceptance of responsibility and one level for agreeing to a VTC sentencing hearing, Mr. Zotea is an offense level 30 with a guideline range of 151-188 months. Using the guideline range for the same amount of cocaine, after adjustments, he is an offense level 20 with a guideline range of 63-78 months. The methamphetamine "penalty" more than doubles Mr. Zotea's guideline range. The methamphetamine guidelines are unreasonably and without justification; they are higher than cocaine, heroin, PCP, marijuana, and hash. The guidelines disparity between methamphetamine and other drugs is not supported by empirical evidence.

The guidelines are expected to yield the appropriate sentence, *Rita v. United States*, 127 S.Ct. 2456, 2465 (2007), 127 S.Ct. at 2465. This is only so, however, if the Sentencing Commission fulfills its "important institutional role," to "'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough v. United States*, 128 S.Ct. 558, 574 (2007). Where a guideline does not exemplify the Commission's exercise of this function, a district court may conclude that its application may yield a sentence that is greater than necessary to achieve the goals of §3553. Id.

In *Kimbrough,* this led to an affirmance of a district court's choice to disregard the crack cocaine guidelines in imposing sentence. Those guidelines, as the Supreme Court exhaustively detailed in *Kimbrough*, were flawed from their origin: they were not based on the Commission's own gathering of empirical data and the deliberative considerations of its experts, but merely tracked mandatory minimums enacted in a flurry of legislative action based on faulty premises, and fears of harm that were never confirmed.

The argument regarding crack made in *Kimbrough* applies to methamphetamine. Much like the hype surrounding crack cocaine in the 1990s, portrayals of methamphetamine in the media circulate misinformation about an epidemic that Congress has used to skyrocket sentences for the drug. There is no empirical evidence that methamphetamine is appreciably different than any other drug in terms of its harm to individuals or the community. The Court

should not impose the advisory guideline sentence based on myths about methamphetamine unsupported by science.

Hart, Csete and Habibi from Columbia University issued a research paper in February of 2014 titled, "*Methamphetamine: Fact vs. Fiction and Lessons from the Crack Hysteria*" (a copy is attached as Exhibit 1). Their research details the crack cocaine and methamphetamine hysteria and how it is devoid of any scientific support. The parallels are clear enough to demonstrate that history is repeating itself—mistakes and all.

> "The emotional hysteria driving public policy on methamphetamine is causing great harms that are avoidable. In an effort to avoid making many of the same mistakes that were made with crack cocaine with regard to stigma, public policy and general misinformation, the purpose of this report is to provide a critical examination of the available evidence on methamphetamine use and its consequences in the United States and internationally. It is the aim of this report to dispel some of the myths about the effects of methamphetamine and other illicit drugs using the best available scientific data."

*Hart, Csete and Habibi* at 5

In conclusion, they find,

> "Evidence presented in this report suggests that illicit ATS use, primarily methamphetamine use, has become the new crack cocaine with respect to sensational media reporting about the extent of ATS use and hyperbolic description of the disastrous consequences of methamphetamine addiction. It has taken nearly three decades for the public to come to a superficial understanding that the deleterious effects of crack cocaine were greatly exaggerated in mass media and government statements. The monetary and human costs of our earlier misunderstandings about crack cocaine are incalculable. Today, unfortunately, much of the public information about methamphetamine has little foundation in evidence. Overblown worst-case

anecdotes are usually disseminated uncritically by the popular press and accepted as sound evidence by an undiscerning public."

*Hart, Csete and Habibi* at 29.

In the *United States v. Willie Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013), attached as Exhibit 2, the Honorable Mark W. Bennett, of the Northern District of Iowa, conducts an exhaustive *Kimbrough* analysis. His 44-page order concludes that the Sentencing Guidelines for methamphetamine are not based upon empirical data and are excessive.

Judge Bennett states on page 1023,

"While the reasoning is unknown, the Commission made 1 gram of methamphetamine equal to 2 grams of cocaine." On page 1026, he stated, "The level of harmfulness is difficult to measure and many drug abuse experts contend that methamphetamine is not the most harmful drug. (Citations.) A study by David J. Nutt and colleagues consistently rank alcohol, heroin, and crack cocaine as more harmful than methamphetamine. David J. Nutt et al., Drug Harms in the UK: a multi criteria decision analysis, 376 THE LANCET 1558 (2010). "For legislative purposes, drugs have mostly been classified according to their addictive potency. Such classifications, however, lack a scientific basis." Jan van Amsterdam et al, Ranking the Harm of Alcohol, Tobacco and Illicit Drugs for the Individual and the Population, 16 EUR. ADDICTION RESEARCH 202, 202–204 (2010) (ranking the mean harm scores of crack cocaine, heroin, tobacco, and alcohol higher than methamphetamine)."

Mr. Zotea requests this Honorable Court apply the same reasoning and analysis when determining whether the Guidelines for Methamphetamine are fair and based upon empirical data and study.

### 7.2 The Guideline Distinction Between Actual Methamphetamine and Methamphetamine Mixture is Unfounded

For most drug offenses, the base offense level reflects the type and quantity of drug(s) involved. For methamphetamine, however, the Guidelines distinguish between two forms of

Case 2:24-cr-00579-WLH Document 215-2 Filed 10/26/26 Page 10 of 15 Page ID

methamphetamine powder: actual and mixture. The base offense level for methamphetamine depends on the purity of the drug, using a 10: 1 ratio to distinguish between pure, or "actual," methamphetamine and an equivalent total weight of a mixture containing methamphetamine.

The result is that 10 grams of pure methamphetamine is treated the same as 100 grams of methamphetamine mixture for calculating a defendant's Guidelines sentencing range. The Guidelines direct: "[i]n the case of a mixture or substance containing [methamphetamine], use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the [actual methamphetamine], whichever is greater." U.S.S.G. § 2Dl.1 Notes to Drug Quantity Table (B).

The distinction between actual methamphetamine and a mixture containing methamphetamine under the guidelines significantly affects the base offense level of methamphetamine. This results in divergent sentencing outcomes for similarly situated defendants. For example, a criminal defendant charged with possession of 25 grams of mixed methamphetamine starts with a base offense level of 18 under the Sentencing Guidelines; however, should the same 25 grams of methamphetamine be tested for purity and determined to be at least 80 percent pure, the base offense level increases to a level of 26.

There is no empirical basis for the Commission's decision to treat offenses involving pure methamphetamine more severely than offenses involving methamphetamine mixture. Without empirical support showing why there is a disparity in treatment of the two, applying the higher offense level for actual meth deserves little deference.

Because today's methamphetamine is substantially pure, purity is not a proxy for relative culpability. Data from the Drug Enforcement Agency (DEA) show that, from 2011 to 2016, the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in early 2014, and most recently, for the third quarter of 2016, averaged 93.5 percent pure. "Methamphetamine per gram purity levels averaged above 90 percent, while price data through December 2018 indicates meth availability remained high and prices remain low." See DEA, *2019 National Drug Threat*

*Assessment* (Dec. 2019), https://www.dea.gov/documents/2020/01/30/2019-national-drug-threat-assessment at pages p 44-45.

The problem is compounded because not all methamphetamine seized from a defendant is tested for purity, and the reasons it is or is not tested are often arbitrary, with no relation to a defendant's culpability or danger to society.

This disparity is illustrated in this case. Mr. Zotea's sentencing guideline level is calculated using methamphetamine (actual), resulting in an offense level of 32. On February 28, 2019, Zotea delivered 109.56 grams of actual methamphetamine. The net weight was 111.8 grams and tested 98% pure. On March 11, 2019, Zotea delivered 110.47 grams of actual methamphetamine. The net weight was 111.59 grams and tested 99% pure. On March 27, 2019, Zotea distributed 206.5 grams of actual methamphetamine. The net weight was 217.4 grams and tested 95% pure.

In total, Mr. Zotea is responsible for total methamphetamine (mixture) of 440.79 and methamphetamine (actual) of 426.53. The DEA lab reports are attached collectively in Exhibit 3.

If the total methamphetamine (mixture) is used, instead of actual, his guideline level is 28. Since the purity was high, as in all street sales of meth, his offense level jumps to 32. There is no empirical basis for this disparity. Because the government opted to test the purity, a substantial unsupported disparity is created, and a variance is warranted.

# Exhibit 1

# METHAMPHETAMINE: FACT VS. FICTION AND LESSONS FROM THE CRACK HYSTERIA

Carl L. Hart, Joanne Csete, Don Habibi

Department of Psychology, Columbia University,

Division on Substance Abuse, New York State Psychiatric Institute and

Department of Psychiatry, College of Physicians and Surgeons of Columbia University,

Institute for Research in African-American Studies, Columbia University,

Open Society Foundation

and

Department of Philosophy, University of North Carolina Wilmington

**Address Correspondence to:**

Carl L. Hart, Ph.D.
New York State Psychiatric Institute
1051 Riverside Dr., Unit 120
New York, NY 10032, U.S.A.
Voice (212) 543-5884
FAX (212) 543-5991
clh42@columbia.edu

**Executive Summary**

The purpose of this report is to provide a critical examination of the available evidence on illicit methamphetamine use and its consequences in the United States and internationally. It is the aim of this report to dispel some of the myths about the effects of methamphetamine and other illicit drugs using the best available scientific data. Further, it is our hope that this analysis will lead to more rational policies for dealing with both legal and illegal amphetamine. The report begins with an examination of the lessons learned from the "crack cocaine scare" in the 1980s. In this way, the reader can draw parallels between society's response to crack cocaine then, and methamphetamine now. The report then describes distinctions and similarities between methamphetamine and other amphetamine-type stimulants. Also examined is the prevalence of methamphetamine use and public policies in response to the perceived increased use of the drug and perceived drug-related problems. Finally, the report critically reviews the scientific literature on the effects of methamphetamine on the brain, physiology, and behavior. The data show that many of the immediate and long-term harmful effects caused by methamphetamine use have been greatly exaggerated just as the dangers of crack cocaine were overstated nearly three decades ago. Recommendations are made in an effort to remedy this situation and to enhance public health and safety.

## Introduction

*Lesson Learned from Crack in the United States*

The emotional hysteria that stems from misinformation related to certain illegal drugs often leads to more harm than the drugs themselves. In the United States during the mid-1980s, for example, crack cocaine was believed to be so powerfully addictive that even first-time users would become addicted. Even more worrisome was the perception that the drug produced unpredictable and deadly effects. Despite the fact that there was virtually no real evidence supporting these claims, in 1986, the United States Congress passed the now infamous Anti-Drug Abuse Act setting penalties 100 times harsher for crack than for powder cocaine convictions. The law stated that a person convicted of selling 5 grams of crack cocaine was required to serve a minimum sentence of five years in prison; convictions involving 50 grams of crack carried a minimum sentence of 10 years. To receive similar sentences for trafficking in powder cocaine, individuals needed to have been caught selling (or intending to sell) 500 grams and 5 kilograms of cocaine, respectively.

By 1988, concern about the drug had increased so much that penalties of the 1986 law were extended to persons convicted of simple possession. Even first-time offenders faced such stiff mandatory sentences. Simple possession by a first-time offender of any other illegal drug, including powder cocaine or heroin, carried a *maximum* penalty of one year in prison.

The driving force behind passage of these anti-crack laws was the exaggerated claims made in the media on a near-daily basis. Multiple stories warned of "crack-crazed" addicts. In the months before the 1986 elections, more than 1,000 stories on cocaine appeared in the national press, including five cover stories in *Time* and *Newsweek*. *Time* magazine called crack cocaine the issue of the year. When the furor about crack had settled, two things were clear. First, media accounts about the effects of the drug were inconsistent with the scientific data. There are no pharmacological differences between crack and powder cocaine to justify their differential treatment under the law. Figure 1 shows the chemical structures of cocaine hydrochloride and cocaine base (crack). The structures are nearly identical.

**Figure 1 Chemical structure of cocaine hydrochloride (powder cocaine) and cocaine base (crack)**




The two forms of cocaine produce identical effects; these effects are predictable (Hatsukami and Fischman, 1996). That is, as the dose is increased, so are the effects, whether they are blood pressure and heart rate *or* subjective "high" and addictive potential. The way the drug is taken differs based on its form, however. Crack is smoked, whereas powder is swallowed, snorted, or injected. More intense effects are observed when the drug is smoked or injected intravenously, but the drug itself remains the same. To punish crack users more harshly than powder users is analogous to punishing those who are caught smoking marijuana more harshly than those caught eating marijuana-laced brownies.

Another consequence that became apparent was that the differences between crack and powder laws disproportionately targeted blacks. A whopping 85 percent of those sentenced for crack cocaine offenses were black, despite the fact that the majority of users of the drug were white (USSC 1995, 1997, 2002, 2007). Frustrated by the lack of willingness of lawmakers to eliminate the disparity between crack and powder cocaine penalties, in 2007, even presidential candidate Barack Obama voiced strong concerns: "…let's not make the punishment for crack cocaine that much more severe than the punishment for powder cocaine when the real difference between the two is the skin color of the people using them…That will end when I am President." On August 3, 2010, President Obama signed legislation that decreased, but did not eliminate, the sentencing disparity between crack and powder cocaine offenses. The new law reduced the sentencing disparity from 100:1 to 18:1.

While we recognize the improvement this compromise represents, it remains an inadequate solution because the scientific evidence does not support disparate penalties for crack and powder cocaine violations. And when one considers the perception of the egregious racial injustice that occurred in enforcing these laws, it is not difficult to draw a similar conclusion to the one drawn by Malcolm X in 1964 when asked whether the U.S. had made sufficient progress towards racial equality. He said "If you stick a knife in my back nine inches and pull it out six inches, there is no progress… The progress is healing the wound."

*Methamphetamine: the new crack*

There are multiple signs indicating that methamphetamine is the current drug about which exaggerated media claims are made. As with the "crack scare" of the 1980s, many high-profile stories about methamphetamine have appeared in the global press. On August 8, 2005, for example, *Newsweek* ran a dramatic cover story called "The Meth Epidemic." Use of this drug, according to the magazine, had reached epidemic proportion. The evidence suggested otherwise. At the height of methamphetamine's popularity, there were never more than a million current users of the drug in the United States. This number is considerably lower than the 2.5 million cocaine users, the 4.4 million illegal prescription opioid users, or the 15 million marijuana smokers during the same period. In the United States, the number of methamphetamine users has never come close to exceeding the number of users of these other drugs (SAMHSA 2012).

Media coverage has been filled with accounts of desperate users turning to crime to support their use of the "dangerously addictive" drug. Many articles focused on the "littlest victims." The *New York Times* headlined one story, "Drug Scourge Creates Its Own Form of Orphan," describing an apparent rise in related foster care admissions and reports of addicted biological parents who were impossible to rehabilitate. The paper quoted a police captain who said methamphetamine "makes crack look like child's play, both in terms of what it does to the body and how hard it is to get off" (Butterfield 2004). The paper also claimed: "Because users are so highly sexualized, the children are often exposed to pornography or sexual abuse, or watch their mothers prostitute themselves" (Zernike 2005).

Then United States Attorney General Alberto Gonzales called it "the most dangerous drug in America," and President George W. Bush proclaimed November 30, 2006 National Methamphetamine Awareness Day. Back in 1986, President Ronald Reagan proclaimed the entire month of October Crack/Cocaine Awareness Month.

The parallels are clear enough to demonstrate that history is repeating itself—mistakes and all. The emotional hysteria driving public policy on methamphetamine is causing great harms that are avoidable. In an effort to avoid making many of the same mistakes that were made with crack cocaine with regard to stigma, public policy and general misinformation, the purpose of this report is to provide a critical examination of the available evidence on methamphetamine use and its consequences in the United States and internationally. It is the aim of this report to dispel some of the myths about the effects of methamphetamine and other illicit drugs using the best available scientific data. Further, it is our hope that this analysis will lead to more rational policies for dealing with both legal and illegal amphetamine.

**What is methamphetamine?**

Amphetamine is a class of chemical compounds that includes drugs used for both medical and recreational purposes. Of this class, *d*-amphetamine and methamphetamine are approved in several countries to treat a variety of disorders, including attention-deficit hyperactive disorder (ADHD), narcolepsy, and obesity. These drugs as well as other amphetamines [e.g., 3,4-methylenedioxyamphetamine (MDA), and 3,4-methylenedioxymethamphetamine (MDMA: as known as ecstasy, Molly, or Mandy)] are used recreationally.

In recent years, a range of other substances has also been grouped with amphetamine to comprise a class of drugs known as amphetamine-type stimulants (ATS). In addition to the amphetamines mentioned, other ATS include, but are not limited to, methcathinone, fenetylline, ephedrine, pseudoephedrine and methylphenidate. The major rationale for the inclusion of these drugs as ATS is that they are synthetic stimulants. Cocaine is not an ATS because it is not manufactured synthetically, although it is classified as a stimulant. From a behavioral or neuropharmacological perspective, the grouping of ATS makes little sense. Methylphenidate (Ritalin) and cocaine produce similar effects on human behavior and on monoamine neurotransmitters, which modulate mood and other functions.

Yet, only methylphenidate is included as an ATS. Hence, the ATS grouping seems somewhat arbitrary. Another concern is that such grouping facilitates the exaggeration of the extent of global amphetamine use because a large number of different drugs are all included in one class.

For purposes of this report, the primary focus will be on methamphetamine. However, because global ATS prevalence data include other compounds as well, an exclusive focus on methamphetamine is nearly impossible. With this caveat in mind, our rationale for limiting the focus on methamphetamine, where possible, is because it has generated the greatest amount of concern. Indeed, periodically there are statements in the scientific and popular literature attesting to methamphetamine's greater potency and "addictive" potential, relative to other amphetamines. Such statements, however, are inconsistent with the empirical evidence. In carefully controlled laboratory studies of human research participants, *d*-amphetamine and methamphetamine produce nearly identical physiological and behavioral effects (Martin et al. 1971; Sevak et al. 2009; Kirkpatrick et al. 2012). They both increase blood pressure, pulse, euphoria, and desire to take the drug in a dose-dependent manner. Essentially, they are the same drug.

One reason for the unfounded beliefs about the drugs might be related to the fact that methamphetamine is more readily available on the illicit market due to its apparent easier synthesis. A quick search of the internet can provide the surfer with dozens of "How to make meth" recipes. According to these recipes and law enforcement personnel, methamphetamine can be 'easily' made from a few common products, the most important of which is the over-the-counter cold medication, pseudoephedrine. This makes methamphetamine all the more accessible to the poor, the marginalized, those wishing to avoid the medical establishment, and other interested consumers. There is a large underclass of people who cannot afford to see a physician in order to receive a referral to a psychiatrist to obtain a prescription for legal amphetamine. Moreover, there are many people who are skeptical of psychiatrists, who consider it a stigma to be under psychiatric care, or who, quite rationally, do not want any mental health issues to appear on their medical records.

Undoubtedly, there are also many people who have no medical or neurological condition that would qualify them for a prescription, but who nonetheless seek stimulants for personal reasons, be they work-related or recreational. As a result, it is not surprising that methamphetamine is the most frequently abused amphetamine.[1] But this has less to do with pharmacology and more to do with access or availability.

**Global extent of methamphetamine use**

Nonetheless, over the past two decades excessive illicit amphetamine use has become a major global concern. According to data from the United Nations Office on Drugs and Crime (UNODC) in 2011, ATS were used at rates higher than any other drug class with the exception of cannabis (UNODC, 2013). The number of cannabis users worldwide (on an annual basis) is estimated to be about 180 million, ATS users about 34 million, opiate users 16.5 million, and cocaine users about 17 million (UNODC 2013). These estimates are based on information provided by individual governments to UNODC, and confidence intervals around them are wide. The high side of the confidence interval for ATS use, for example, indicates that as many as 50 million people may use it during a year. Data from some governments distinguish methamphetamines from other ATS, while others do not

In many countries, there are no population-based data on the extent of illicit drug use. Since illicit drug use in many countries is subject to severe criminal sanctions, it is likely that a substantial proportion of illicit drug users are unwilling to disclose information about their use, especially to government-sponsored survey takers. Of course, these factors affect illicit drug use estimates generally, but data collection on consumption of ATS is even more fraught with difficulty than with respect to other drugs. This is because, unlike the processing of coca into cocaine and of opium into heroin and other opiates, the manufacture of methamphetamine does not rely on primary products that can be grown only in special locations. As noted by Degenhardt and colleagues (2010), methamphetamine can be and is manufactured in a much wider variety of locations and "under more clandestine conditions and for comparatively less cost."

---

[1] The terms "abuse" and "dependence", as they are used throughout this report, conform to the Diagnostic and Statistical Manual of Mental Disorders 4th Edition (DSM-IV-TR) and International Statistical Classification of Diseases and Related Health Problems (ICD-10) definitions of substance abuse and dependence. DSM-IV-TR and ICD-10 terminology are used to avoid the use of pejorative words and terminology that have multiple meanings.

Case 2:24-cr-00570-WLH Document 158-2 Filed 01/26/26 Page 18 of 68 Page ID #:116


A good illustration of this point is the production of homemade methamphetamine (known as pervitin) in the Czech Republic. In the early 1970s, according to Zábranský (2007), one individual perfected a simple process for producing pervitin from an ephedrine-containing cough medicine available over the counter and the technique quickly spread, even at the risk of harsh punishment during the period of Soviet control. Pervitin use and production are perceived to be extensive in the Czech Republic even today (Mravcik et al. 2011), although data supporting this perception are lacking.

While absolute numbers of users of ATS at a given moment is difficult to estimate, better trend estimates of use can be discerned when prevalence data are combined with government seizure statistics over time. Based on such data, UNODC's most recent report concluded that markets for methamphetamine are growing faster than for other ATS, fueled in part by significant increases in East and Southeast Asia, the United States and Mexico in the last five or six years (UNODC 2012). Figure 2 illustrates the dramatic increase in seizures in East and Southeast Asia since 2008. Methamphetamine markets in Europe, while small relative to those of North America, have also expanded since 2009 based on seizure data, especially in Scandinavia and Turkey (UNODC 2012). Seizure data alone may be misleading in that increases in seizures may reflect better investments in policing rather than real increases in production, and declines in seizures may reflect producers' improved ability to evade capture rather than a real decline in production. This point highlights the importance of combining multiple types of data to shed light on drug use prevalence rates.

On behalf of the United Nations Reference Group on HIV and Injecting Drug Use, Degenhardt et al. (2010) conducted an extensive review of the literature on the extent of methamphetamine and ATS use and means of consumption around the world. They observed that all regions of the world have some documented illicit ATS use, including methamphetamine use. While production was highest in the Middle East, Southeast Asia and North America (including Mexico), production in Africa, especially South Africa, was increasing (Degenhardt et al. 2010). Some have suggested that stringent measures taken in the United States to limit access to methamphetamine precursors (e.g., pseudoephedrine) have decreased United States production but have increased production in Mexico (Colfax et al. 2010).

**Figure 2. Methamphetamine tablets seized in East and South-East Asia, 2008-2010**




Source: UNODC, *World Drug Report 2012*, p 53.

Data from drug treatment centers that track the preferred drugs among those seeking treatment can also aid in determining ATS prevalence rates. But, as is the case with seizure data, this information should be used in combination with other information such as drug use prevalence data because it too, when used alone, has serious limitations. For example, it is likely that many marginalized drug abusers are under-represented in such data because drug treatment may not be available to them for a variety of reasons ranging from an inability to pay for services to a lack of treatment facilities. On the other hand, some individuals may be encouraged to exaggerate the extent of their drug use in order to receive drug treatment in lieu of receiving a prison sentence. So, it is conceivable that a large proportion of ATS users are excluded from this type of data or the drug use rates of treatment-seekers may be less than accurate. These caveats notwithstanding, Figure 3 shows that the percentage of individuals seeking treatment for methamphetamine use dramatically increased in the Western Cape Province of South Africa between 2002 and 2011 (SACENDU 2012). Based on the available information, it might be supposed that the number of clandestine amphetamine laboratories has risen along with the number of people seeking treatment for amphetamine use problems. As we noted above, the increased number of amphetamine seizures could simply reflect a greater focus, in terms of resources and attention, by various law enforcement agencies to this problem. Similarly, in recent years the presence of more treatment facilities may also have increased the number of people seeking amphetamine-related treatments.

Even with these caveats, it seems clear that the extent of illicit methamphetamine use deserves of the attention of public health officials. The strategies for addressing problems related to illicit amphetamine use and abuse, however, should be mindful of the strengths and limitations of our current data.

**Figure 3 Methamphetamine as primary and secondary drug of use among people seeking treatment in Western Cape Province, South Africa**




**Source:** SACENDU Research Brief 15(1), 2012

**Policy, law and programs: national and multinational responses to methamphetamines**

*Methamphetamine scare: Scare tactics sold as drug prevention*

Like crack cocaine, methamphetamine in North America has been the object of sensational "scare" campaigns in the media, fed by nearly everyone -- from scientists to healthcare professionals to law enforcement personnel to politicians. Jenkins (1994) describes an early such flood of media reports on "ice" or smokable methamphetamine, which resulted in Congressional hearings and a national panic, though consumption of ice was largely confined to Hawaii. Media reports suggested that the whole of the US would be deluged by "epidemic" levels of use of ice in a short time, ushering in an "ice age" (Jenkins 1994). Jenkins concluded that the demonization of crack versus powder cocaine paved the way for the demonization of ice versus other amphetamines, and that the ice scare served a particular political purpose for certain politicians in Hawaii and beyond who needed to portray themselves as "tough on drugs." Indeed, as discussed above, a similar situation occurred with crack cocaine in the late 1980s.

Both liberal and conservative politicians added their voice to the cacophony that blamed crack for everything from premature death to child abandonment and neglect to high crime and unemployment rates.

A decade later – in the late 1990s – the methamphetamine hysteria in the United States began to generate considerable interest among public officials; some were even making explicit connections with crack cocaine in their demonizing of the drug. Then Oklahoma Governor Frank Keating characterized methamphetamine in this way: "It's a white trash drug -- methamphetamines largely are consumed by the lower socio-economic element of white people and I think we need to shame it. "Just like crack cocaine was a black trash drug and is a black trash drug" (Senate Communications Division, 1999).

Since 2000, concerns about methamphetamine have further intensified. Most media portrayals of methamphetamine use emphasized unrealistic effects and exaggerated the harms associated with the drug. For example, in January 2010, National Public Radio (NPR) ran a story entitled, "This is your face on meth, kids" (NPR, 2010). The story described a California sheriff who was trying to stop young people from experimenting with methamphetamine. With the help of a programmer, he developed a computer program that digitally altered teenagers' faces to show them what they would look like after using methamphetamine for 6, 12, and 36 months. These young people watched their images change from those of healthy, vibrant individuals to faces marred by open scabs, droopy skin, and hair loss. They were told that these were the direct physiological effects of using methamphetamine. Ninety percent of individuals who tried methamphetamine once, they were also told, would become "addicted."

There is no empirical evidence to support the claim that methamphetamine causes physical deformities. Of course, there have been the pictures of unattractive methamphetamine users in media accounts about how the drug is ravaging some rural town. The infamous "meth mouth" images (extreme tooth decay) have been widely disseminated. But, consider this: methamphetamine and Adderall are essentially the same drug. Both drugs restrict salivary flow leading to xerostomia (dry mouth), one proposed cause of "meth mouth." Adderall and generic versions are used daily and frequently prescribed – each year they are among the top 100 most prescribed drugs in the United States – yet there are no published reports of unattractiveness or dental problems associated with their use. The physical changes that occurred in the dramatic

Case 2:24-cr-00570-WLH Document 242-158-2 Filed 06/05/26 Page 14 of 31 Page ID



depictions of individuals before and after their methamphetamine use are more likely related to poor sleep habits, poor dental hygiene, poor nutrition and dietary practices, and media sensationalism. With regard to the addictiveness of methamphetamine, the best available information clearly shows that the overwhelmingly majority of people who try methamphetamine will not become addicted (O'Brien and Anthony 2009). Less than 15 percent of those who have ever used the drug will become addicted. The bottom line is that the overwhelming majority of methamphetamine users use the drug without problems.

Although the hysteria about methamphetamine and crack cocaine use shared many similarities, the perceived users of the respective drugs differed, as indicated above by former governor Keating. Crack users were believed to be black and urban, whereas methamphetamine users were seen as white and rural. As a result, at the start of the new millennium an intense electronic media campaign was initiated targeting many rural communities in the western United States. The stated goal was to prevent young people from experimenting with methamphetamine. In 2005, the state of Montana adopted a graphic advertising campaign called the *Montana Meth Project*. The advertisements show in horrifying details a young person who uses methamphetamine for the first time, and then ends up engaging in some unthinkable act such as prostitution or assaulting strangers for money to buy methamphetamine. At the end of the advertisement, printed on the screen is the message: “Meth, not even once.” A year after its inception, the Montana Meth Project was recognized by the White House for its innovative approach to drug prevention. Indeed, preliminary findings from a report by the Montana Department of Justice suggested that the campaign was successful at decreasing methamphetamine use among teens. This apparent success led several other states to join the “Meth Project” and adopt identical advertising strategies.

Is it true that scare tactic campaigns decrease drug use? More complete evidence would suggest not. A recent critical review of the impact of the Montana Meth Project on methamphetamine use indicated that the advertisement campaign had no effect when preexisting downward trends in methamphetamine use were taken into account (Anderson 2009).

Case 2:24-cr-00570-WLH Document 158-2 Filed 01/26/26 Page 15 of 32 Page ID



One potential reason for the lack of success is that the population most likely to use methamphetamine finds the advertisements laughable because they exaggerate methamphetamine-related harmful effects. These individuals most likely know people who have used the drug, and the information presented in the advertisements is inconsistent with their own knowledge. Here, the parallel is to early propaganda about marijuana and the film "Reefer Madness." The film is now a 'cult classic' because it is widely regarded as a comedy as well as a cautionary tale of official propaganda.

This raises the question, what are the potential negative consequences of presenting exaggerated or misleading information about drugs to young people? Some educators and healthcare professionals have expressed concern that the types of embellishment used by the Montana Meth Project decrease their credibility and relevance and lead many young people to reject other drug-related information from "official" sources, even when the information is accurate. Despite these concerns and no evidence of preventing drug use, the Meth Project remains popular with some officials and continues to use these types of scare tactics (see, http://www.methproject.org/).

***Laws and policies***

Veracity aside, the anti-methamphetamine media campaign and incredible statements made about the drug has led to considerable concern by the general public, which, in turn, inspired policy-makers to pass new legislation. In Canada, for example, a particularly concerted media "scare" campaign on methamphetamine was followed quickly by the legal reclassification of both methamphetamine and its constituent ingredients or precursors, as noted by Boyd and Carter (2010):

> Substances commonly used in the production of methamphetamine, such as red phosphorus and hydriodic acid, were added to the list of Class A [i.e. most highly criminalized] precursors….In August 2005, methamphetamine was rescheduled from a Schedule II to a Schedule I drug under the *Controlled Drugs and Substances Act*. Thus the maximum penalties now apply to methamphetamine, including the possibility of life sentences for trafficking, and production and possession can garner sentences of up to seven years.

Since Boyd and Carter's analysis was published, the government of Canada passed into law a wide-ranging crime bill that imposes mandatory minimum sentences for many categories of drug crimes (Cohen 2012). This measure will likely mean that for minor methamphetamine convictions, for example, a judge inclined to give a lighter sentence will not be able to do so.

In some countries, the perception of problems associated with the abuse of amphetamine has become so worrisome that even more drastic measures have been taken. Topping the list is Iran, which has a mandatory death penalty for possession of 30 grams of methamphetamine in a regime with extremely harsh penalties for all drug offenses. Moreover, the executions can be drawn out and extremely painful (Mogelson, 2012). In response to reports of precipitous increases in methamphetamine abuse, in 1996 the government of Thailand banned all uses of amphetamine, including those for medical purposes (Pilley and Perngpam, 1998). Other governments have also taken steps to restrict legal uses of amphetamine, although most have not been as extreme as those taken in Iran and Thailand. For example, in the United Kingdom and New Zealand, while *d*-amphetamine remains available for medical purposes, any use of methamphetamine (including medical use) has been banned. Recall that *d*-amphetamine and methamphetamine are essentially the same drug (e.g., Kirkpatrick et al. 2012).

In the United States, new laws have also been implemented in response to the increased negative advertising campaign waged against the drug. These laws focus on both methamphetamine and compounds used to make the drug illicitly (i.e., precursors). Amphetamine tablets were available over the counter in the United States until the early 1950s (Maxwell and Rutkowski 2008). In 1970, in response to perceived abuses of the drug in the 1960s, amphetamine was placed under Schedule II of the newly passed Controlled Substances Act. This meant that all amphetamines were classified under the most restrictive category for drugs available by prescription. Other Schedule II drugs include cocaine and morphine. More recently, the Comprehensive Methamphetamine Control Act of 1996 increased criminal penalties for trafficking and producing methamphetamines. The law also restricted access to precursors, including ephedrine and pseudoephedrine, which were key ingredients in over-the-counter cold medicines (Franco 2005).

Case 2:24-cr-00570-WLH Document 158-2 Filed 01/26/26 Page 17 of 32 Page ID #:13



Another change in the United States -- the Methamphetamine Penalty Enhancement Act of 1998 -- lowered the cut-off that would trigger mandatory sentences for methamphetamine trafficking. The Methamphetamine Anti-Proliferation Act of 2000 imposed restrictions on access to precursors, including blister packs for over-the-counter ephedrine and pseudoephedrine. The Combat Methamphetamine Epidemic Act of 2005 increased restrictions on pseudoephedrine. Pharmacists and sellers of medications containing pseudoephedrine were required to place these medications behind the counter and buyers were required to show a state-issued identification card and sign a log that could be used to track their purchases (Gonzales et al. 2010). Fearing that this inconvenience would decrease sales, many pharmaceutical companies simply replaced pseudoephedrine with phenylephrine. Unfortunately, compared with pseudoephrine, phenylephrine is a less effective nasal decongestant, the condition for which these medications are most often used (Eccles 2007). This important unintended consequence is rarely discussed among supporters of these laws.

Given the fact that new laws in the United States restrict availability of an effective cold and flu medication (pseudoephedrine), it is of interest to know whether this approach is effective at decreasing the availability of methamphetamine. Dobkin and Nicosia (2009) studied this question by focusing on two major seizures of pseudoephedrine in the United States in 1995. They concluded that this intervention substantially disrupted the supply of methamphetamine, but that the effect was only temporary. Within four to 18 months, the methamphetamine market had returned to pre-intervention levels. This result suggests that legislation aimed at restricting precursors such as pseudoephedrine may have only short-term effects on illicit drug markets, while it permanently reduces the ability of the whole population to obtain effective cold medications.

Case 2:24-cr-00570-WLH Document 158-2 Filed 12/16/25 Page 16 of 59 Page ID #:12292



**Methamphetamine effects on the brain**

The intense focus on restricting access to methamphetamine suggests that it must be one of the most dangerous drugs with respect to the potential damage to the brain and behavior. Over the past several decades, data from basic research have contributed to an increased understanding of methamphetamine-related effects on cells in the brain.

A comprehensive review of the effects of methamphetamine on the brain is beyond the scope of the current report, and excellent reviews already exist (e.g., Sulzer et al. 2005; Fleckenstein et al. 2007). Here, we present a brief overview because we think it will be useful for the reader to have some understanding of the neurotransmitters involved in the actions of methamphetamine. In this way, we hope to provide the reader with tools to evaluate more accurately "brain statements" made about methamphetamine in the popular media and scientific literature.

As Figure 4 indicates, amphetamine-related drugs bear a striking resemblance to the catecholamine neurotransmitters dopamine and norepinephrine. Catecholamine neurotransmitters are known to play an important role in several behaviors, including movement and mood regulation. They are also known to be involved in malfunctions that lead to disease states. For example, a prominent theory guiding the treatment of clinical depression proposes that too little activity of the neurotransmitters dopamine, norepinephrine, and/or serotonin (together known as monoamine neurotransmitters) can cause depression and too much can cause a manic state. This theory also postulates that drugs such as methamphetamine lead to abuse because they stimulate the "dopamine reward system," which is responsible for telling the rest of the brain "that's good—do that again." Thus, the structural similarities between amphetamine and catecholamine neurotransmitters provide clues about the drugs' mechanisms of action.

**Figure 4** **Chemical structures of neurotransmitters and amphetamines**




Multiple lines of evidence demonstrate that amphetamine causes a release of monoamines from brain cells. Behaviorally, this can have the effect of elevating mood, increasing alertness and vigilance, while decreasing tiredness and sleepiness (e.g., Hart et al. 2003, 2005). These effects can be beneficial for individuals required to work extended hours or workers who have to perform at the circadian nadir of alertness. Undoubtedly, this is the reason that several nations' militaries have used (and continue to use) amphetamine since World War II (Caldwell and Caldwell 2005). The drug helps soldiers fight better and longer. The performance enhancing benefits are widely recognized by students and professionals in most every field from athletics to zoology.

A downside to amphetamine effects on monoamine neurotransmitters is that the drug may also produce toxicity to cells containing these neurotransmitters. An accumulating amount of evidence shows that amphetamine, when administered repeatedly in large doses, promotes the formation of free radicals that damage brain cells. Following release of dopamine, for example, certain enzymes inactivate the neurotransmitter. But, abnormally enhanced dopamine activity – caused by repeated administration of large amphetamine dopamine - may produce an increased formation of free radicals and thereby cause cell injury (Cadet and Krasnova 2009). This, in turn, could lead to persistent deficits in the functioning of dopamine-containing cells.

This knowledge has raised concerns about the potential harmful consequences of methamphetamine abuse on the human brain and behavior. Dopamine-rich areas serve a wide range of important human functions ranging from mood to movement to learning and memory. Indeed, a substantial database collected in laboratory animals suggests that acute and long-term administration of amphetamine produces disruptive effects in several cognitive domains, including learning and memory (for review, see Marshall et al. 2007). There is, however, an important limitation associated with many of these studies when extrapolating the findings to humans: the dosing regimens used did not capture key elements of human recreational amphetamine use, specifically gradual dose escalation. Typically, investigators administered large doses of methamphetamine repeatedly for one or more consecutive days to drug-naïve animals, whereas human recreational drug users usually start with smaller amounts and increase their doses gradually as their drug use progresses. This difference is not trivial because the harmful neurobiological and behavioral changes that occur in response to repeated large doses of methamphetamine can be prevented with prior exposure to several days of escalating doses (Segal et al. 2003; O'Neil et al. 2006; Belcher et al. 2008). Given this situation, it is critically important to employ more ecologically relevant models in future animal studies investigating the impact of amphetamine use on cognitive functioning. These issues underscore the importance of carefully assessing behaviors of interest in humans under rigorous conditions.

## Methamphetamine effects on human physiology and behavior

### *Immediate effects*

There is now a large database investigating the direct effects of methamphetamine on human physiology and behavior (for review, see Hart et al. 2012). These laboratory studies are designed to document the immediate and short-term effects of the drug on measures of cognitive functioning, mood, sleep, blood pressure, heart rate and the drug's addictiveness. These studies employ carefully controlled, within-participant designs, during which participants: (1) complete a baseline battery of tests, which includes the measures of interest; (2) are administered a methamphetamine dose (ranging from placebo to 50 mg); and (3) are reassessed on the battery at predetermined time points for several hours after drug administration. Also, all of the drug doses are given in a double-blind manner – the research participants don't know whether they are getting a placebo or real methamphetamine, nor do the medical staff monitoring the sessions.

The findings to date can be summarized in the following way. After methamphetamine administration, participants reported feeling more euphoric and their cognitive functioning was improved. These effects lasted about four hours. The drug also caused significant increases in blood pressure (BP) and heart rate that lasted for up to 24 hours. The maximum levels were about 150/90 (BP) and 100 (beats per min.). While these elevations were statistically significant, they were well below levels obtained when engaged in a rigorous physical exercise, for example. Another finding was that the drug reduced the amount of time participants slept (Perez et al. 2008). For example, when they took placebo, participants got about eight hours of sleep, but when the 50 mg dose was given, they got only about six hours. Together, the results indicate that a large dose of methamphetamine produced expected effects. The drug didn't keep people up for consecutive days, it didn't dangerously elevate their vital signs, nor did it impair their judgment.

Tellingly, the above human laboratory data are at odds with anecdotal reports and conventional wisdom. Perhaps researchers had not asked the right question. One of the most popular beliefs about methamphetamine is that it is highly addictive, more so than any other drug. So, in another set of experiments, Hart and colleagues set out to address this issue. Under one condition, methamphetamine-dependent individuals were given a choice between taking a big hit of methamphetamine (50 mg) or $5 in cash. They chose the drug on about half of the opportunities. But, when we increased the amount of money to $20, they almost never chose the drug (Kirkpatrick et al. 2012). Similar results were observed among crack cocaine addicts in an earlier study (Hart et al. 2000). Thus, the addictive potential of methamphetamine was not as had been claimed; its addictiveness was not extraordinary. These results also showed that methamphetamine addicts, just like crack addicts, can and do make rationale decisions, even when faced with a choice to take the drug or not. This was consistent with the literature assessing cognitive functioning of methamphetamine users, but as noted below, only if one looked carefully and guarded against much of the biased information that influences public perceptions about methamphetamine users (Hart et al. 2012).

While the above results suggest that many of the immediate harmful effects caused by methamphetamine use may have been greatly exaggerated, there are real documented potential negative consequences associated with this drug. For instance, methamphetamine abuse is associated with multiple deleterious medical consequences, including paranoia mimicking full-blown psychosis (Grelotti et al. 2010) and hypertensive crisis leading to stroke (Ho et al. 2009). While serious, such cases are rare, and entail the long-term use of extremely large doses. Still, in order to better understand the potential consequences of long-term use of methamphetamine, in the next section we review the literature on methamphetamine-related brain and cognitive effects by examining individuals who have used the drug illicitly for several years.

***Long-term effects***

What are the long-term effects of methamphetamine on intelligence and brain functioning of addicts? These are people who had used the drugs for many years. In these studies, abstinent methamphetamine addicts and a control group (usually non-drug users) completed a comprehensive set of cognitive tests over the course of several hours, and the results were compared to determine whether or not the cognitive functioning of the methamphetamine addicts was normal. Of course, normality is a relative concept that is determined not only by comparing performance of the methamphetamine group with the performance of a control group, but also by comparing the methamphetamine group's scores with those from a normative dataset, taking into consideration each individual's age and level of education. These requirements are important because they allow us to take into account the relative contribution of age and education in terms of the individual's score and adjust the score accordingly. Simply stated, it would be inappropriate to compare the vocabulary scores of a 16-year-old high school dropout with those of a 22-year-old college graduate. The older college graduate would be expected to outperform the younger high school dropout.

A biased and less than careful reading of the scientific literature might lead one to conclude that methamphetamine addicts have severe cognitive impairment. In one study by Sara Simon and colleagues, the apparent impairments observed among methamphetamine users were so bad that it led the researchers to warn: "The national campaign against drugs should incorporate information about the cognitive deficits associated with methamphetamine…Law enforcement officers and treatment providers should be aware that impairments in memory and in the ability to manipulate information and change points of view (set) underlie comprehension… methamphetamine abusers will not only have difficulty with inferences… but that they also may have comprehension deficits… the cognitive impairment associated with [methamphetamine abuse] should be publicized…" (Simon et al. 2002). But, as one reads this and similar papers more critically there are strong grounds for skepticism. While the data showed that the control participants outperformed methamphetamine users on a few tests, the performance of the two groups was not different on the majority of tests.

More importantly, when the cognitive scores of the methamphetamine addicts in the Simon study are compared against scores in a larger normative dataset, none of the methamphetamine users' scores fall outside the normal range (Hart et al. 2012). Based on all of the data, this indicates that the cognitive functioning of the methamphetamine users is normal. This should have tempered the researchers' conclusions and prevented them from stating such dire warnings. Unfortunately, the inappropriate conclusions drawn by Simon and colleagues are not atypical. The methamphetamine literature is filled with similar unwarranted conclusions. As a result, the apparent methamphetamine addiction-cognitive impairment link has been widely publicized - numerous articles have appeared in scientific journals and the popular press. We contend that this has helped shape an environment in which there is an unwarranted and unrealistic goal of eliminating methamphetamine use at any cost to amphetamine users and to the public.

The reporting of brain imaging findings has been especially misleading. On July 20, 2004, for example, *The New York Times* printed an article entitled, "This Is Your Brain on Meth: A 'Forest Fire' of Damage." It stated: "People who do not want to wait for old age to shrink their brains and bring on memory loss now have a quicker alternative—abuse methamphetamine . . . and watch the brain cells vanish into the night." This conclusion was based on a study that used magnetic resonance imaging (MRI) to compare brain sizes of methamphetamine addicts with those of non-drug-using healthy individuals (Thompson et al. 2004). The researchers also assessed the correlation between memory performance and several brain structural sizes. They found that methamphetamine users' right cingulate gyrus and hippocampus were smaller than controls by 11 and 8 percent, respectively. Memory performance on only *one* of four tests was correlated with hippocampal size (i.e., individuals with larger hippocampal volume performed better). As a result, the researchers concluded, "chronic methamphetamine abuse causes a selective pattern of cerebral deterioration that contributes to impaired memory performance." This interpretation, as well as the one printed in *The New York Times* article, is inappropriate for several reasons.

First, brain images were collected at only one time point for both groups of participants. This makes it virtually impossible to determine whether methamphetamine use *caused* "cerebral deterioration," because there might have been differences between the groups even before methamphetamine was ever used. Second, the non-drug users had significantly higher levels of education than methamphetamine users (15.2 vs. 12.8 years, respectively);

it is well established that higher levels of education lead to better memory performance. Third, there were no data comparing methamphetamine users with controls on any memory task. This, in itself, precludes the researchers from making statements regarding impaired memory performance caused by methamphetamine. Nonetheless, the only statistically significant cognitive finding was a *correlation* of hippocampal volume and performance on one of the four tasks. This finding is the basis for the claim that methamphetamine users had memory impairments, because the hippocampus is known to play a role in some long-term memory; but other brain areas are also involved in processing long-term memory (e.g., overlying temporal neocortex). The size of these other areas was not different between the groups. Finally, the importance for everyday functioning of the brain differences is unclear because an 11 percent difference between individuals, for example, is still most likely within the normal range of human brain structure sizes.

This example is not unique. The brain imaging literature is replete with a general tendency to characterize any brain differences as dysfunction caused by methamphetamine (as well as other drugs), even if differences are within the normal range of human variability (Hart et al. 2012). It would be like comparing the brains of police officers who only completed high school with those of college professors who had obtained a Ph.D. and, then concluding that the officers are cognitively impaired as a result of any differences that might be noted. This simplistic thinking is the main thrust behind the notion that drug addiction is a brain disease. It certainly isn't a brain disease like Parkinson's disease or Alzheimer's disease. In the case of these illnesses, one can look at the brains of affected individuals and make good predictions about the illness involved. We are nowhere near being able to distinguish the brain of a drug addict from that of non-drug addict.

***Other Health Concerns***

Methamphetamine abuse has been shown to exacerbate AIDS pathology, including cognitive deficits (Cherner et al. 2005; Carey et al. 2006), and is associated with reduced immunological response to secondary infections such as hepatitis C (Gonzales et al. 2006).

In addition, concerns about methamphetamine users contracting blood-borne illnesses such as HIV and hepatitis C as a result of their drug use have increased interest in determining the extent to which methamphetamines are injected intravenously. Relative to heroin and cocaine, methamphetamine is injected less frequently (Colfax 2010), but injection rates vary widely from region to region. Degenhardt et al. (2010) observed higher methamphetamine injection rates in parts of East and Southeast Asia, North America, northern and central Europe, the former Soviet states, Australia and New Zealand than in Thailand and the United States.

One factor that may influence whether methamphetamine is injected or consumed by other routes is the purity of the drug. If a drug is less pure, containing only 5-10 percent of the desired compound, for example, then, of course, there is less of it to waste. Moreover, taking a drug by mouth can lead to only 10 to 20 percent bioavailability of the ingested dose. Bioavailability is the proportion of the dose of the drug that reaches its target -- in this case, the brain. One reason that a drug's bioavailability is lower following oral administration is because enzymes in the liver specialize in breaking down chemicals, including methamphetamine, in order to protect the brain and to make any poisons we eat less destructive. This process is called *first-pass metabolism*. It can significantly reduce the effective dose of a drug taken orally. First-pass metabolism can be circumvented by injecting or smoking a drug. In general, illicit methamphetamine purity is high (greater than 80 percent: USDOJ, 2011) compared to drugs such as heroin and cocaine. This might be one reason that intravenous use of the drug has been consistently lower than that of these other drugs. Thus, as public health officials consider consequences for various measures taken to limit illicit amphetamine use, they should also be mindful of the fact that their interventions might alter the route by which methamphetamine users take the drug. And a new route might be potentially more dangerous not only to the user, but also to the general public because of blood-borne diseases.

***Treatment with a focus on agonist replacement therapies***

While several behavioral/psychosocial therapies have been demonstrated to reduce illicit amphetamine abuse, a substantial proportion of individuals do not benefit from these interventions (Lee and Rawson 2008).

This suggests the importance of developing pharmacotherapies for those individuals who may be less responsive to behavioral treatments alone. Pharmacotherapies may be used alone, in combination with behavioral/psychosocial therapies, or in a staged manner following inadequate response to behavioral/psychosocial therapies. Most researchers/clinicians recognize that pharmacotherapies alone will not cure a chronic, relapsing disorder such as substance dependence, in part because the problem of substance dependence is expressed behaviorally. Hence, a major goal is that pharmacotherapies will provide a window of opportunity by relieving withdrawal symptoms, for example, so behavioral/psychosocial interventions can be more effectively implemented.

A key argument for the development of effective methamphetamine abuse treatment medications is that they would reduce illicit drug use in HIV-infected individuals in an effort to slow the progression of the disease or reduce the likelihood of HIV-negative individuals engaging in behaviors that might increase the chances of contracting the disease. The underlying theoretical assumption guiding the use of agonist therapies is that maintenance on a pharmacologically similar medication will induce cross-tolerance to the abused drug. Methadone, a long-acting μ-opioid agonist for opioid dependence and nicotine replacement medications for tobacco dependence have been used as agonist maintenance treatments to prevent relapse and cravings in individuals attempting to maintain abstinence. Agonist maintenance medications typically use safer routes of administration (e.g., oral or transdermal) and produce diminished psychoactive effects.

In contrast to medication development efforts for opioid and nicotine dependence, in which the neurobiological mechanisms mediating reinforcement are fairly well understood, the neuronal mechanisms of action for amphetamine are more complicated. As stated above, amphetamine increases the activity of monoamine neurotransmitters. Accordingly, it has been reasoned that medications that more closely mimic the actions of the methamphetamine on monoaminergic activity may be useful in treating methamphetamine abuse.

A number of published single-blind studies and case reports indicate that maintenance on oral amphetamines may be helpful in the treatment of methamphetamine abuse (Fleming and Roberts 1994; 1994; Pates et al. 1996; Bradbeer et al. 1998; Shearer et al. 2001). These studies have reported that amphetamine maintenance has many positive outcomes, including reductions in illicit amphetamine use and in injecting as well as improvements in general health. Such programs increase treatment retention and the number of users presenting for healthcare services. Importantly, reported incidence of adverse effects during amphetamine maintenance has been extremely low. However, it is important to note that most data were collected under non-blind conditions, which increase the likelihood of positive results. To address this concern, Longo et al. (2009) completed a randomized, double-blind placebo-controlled trial assessing the effectiveness of sustained-release *d*-amphetamine (average dose 80 mg/d) for treating amphetamine dependence. Positive results were obtained on two of the three outcome measures: the amphetamine maintenance group had significantly better treatment retention and a lower degree of methamphetamine dependence compared with the placebo group. On the third outcome measure (self-reported drug use), there was a trend toward reduced amphetamine use in the amphetamine maintenance group, but it did not reach statistical significance.

The above observations suggest that carefully controlled, double-blind investigations of long-acting oral amphetamine should be expanded. Such therapies may not only be important for curtailing illicit methamphetamine use, but may also be critical for reducing public health risk associated with contraction, progression, and transmission of HIV. It is important to note that prior to initiating such therapies, clinicians should be cognizant of the fact that our knowledge is incomplete and should be prepared to alter their actions as new, more complete knowledge dictates.

***Harm reduction***

As described in this report, we have learned a great deal about the conditions under which either positive or negative effects are more likely to occur with amphetamine use. Low to moderate doses of amphetamine can improve mood, enhance performance, and delay the need for sleep. Repeated administration of large doses of the drug can severely disrupt sleep and lead to psychological disturbances, including paranoia. Unfortunately, this knowledge is rarely disseminated to the public in an unbiased manner, primarily because of the irrational belief that it might lead one to engage in drug use. In light of the fact that there may be as many as 50 million people who use illegal ATS on an annual basis, it seems that a rational approach – one that aims to reduce drug-related harms – would be to share what we have learned with drug users and those in positions to help keep them safe. Otherwise, we may do society a major disservice.

If more amphetamine users were aware of a few simple facts that we have learned, this would substantially enhance public health and safety. First, inexperienced amphetamine users should be discouraged from taking these drugs in the manner in which experienced users do. Experienced users tend to take drugs in ways that get them to the brain quickly, i.e., smoking or intravenous injections. Because smoking and injecting produce more potent effects, the likelihood of harmful consequences is increased with these methods. Alternatively, taking a drug by mouth is usually safer than other ways of consuming drugs for two reasons: 1) the stomach can be pumped in case of an overdose; and 2) some of the drug will be broken down before reaching the brain, resulting in a muted effect.

This is the idea behind an innovative harm reduction program for methamphetamine users in the Czech Republic, which takes its cue from users' own practices (Mravčík et al. 2011). Some people who use methamphetamines in the Czech Republic engage in what they call "parachuting" or swallowing a bolus of pervitin wrapped in a piece of plastic. The main practitioners of this method were people who wanted to inject less or who had trouble injecting because of damaged veins. Service providers in low-threshold facilities are facilitating this process by making available gelatin capsules, which are superior to an improvised plastic wrapper as something to swallow (Mravčík et al. 2011). Czech service providers hope that this method will encourage some people who use methamphetamines to shift from injection to oral use.

Second, healthy sleep habits should be stressed for all drug users because prolonged sleep loss can cause deterioration of mental functioning. In severe cases of sleep deprivation, even without drugs, hallucinations and paranoia may also occur. Because amphetamines reliably reduce fatigue and offset performance decrements, some may repeatedly take these drugs to lessen problems associated with sleep loss. This is a less than ideal approach. One of the most consistent effects of stimulants is the disruption of sleep, which means that repeated use could exacerbate problems related to sleep loss. Given the vital role that sleep plays in healthy functioning, regular users of amphetamine should be mindful of their sleep durations and avoid drug use near the sleep period. In cases of severe sleep disruptions caused by amphetamine, medical healthcare professionals should be consulted to determine whether a sleeping aid is appropriate.

Third, people who inject methamphetamine should be provided access to clean injection equipment. The effectiveness of needle exchange programs for HIV prevention among people who inject other drugs is supported by a large database (Wodak and Cooney 2004). There is little available information on needle exchange programs targeting amphetamine users, despite the fact that UNODC recommends needle and syringe programs as a central element of HIV prevention (UNODC 2012).

Alternatively, for individuals who smoke amphetamine, harm reduction services should include access to clean pipes, plastic tips, filters, lip balm and smoking foil. Presumably, these measures will decrease the likelihood of exchanging bodily fluids and encourage other health promoting behaviors. For example, researchers in Ottawa, Canada, found that cocaine users -- who used the drug via both smoking and injection -- tended to inject less when smoking equipment was readily available; they also engaged in less sharing of potentially contaminated smoking equipment (Leonard et al. 2008).

**Conclusions and Recommendations for Policy and Research**

Evidence presented in this report suggests that illicit ATS use, primarily methamphetamine use, has become the new crack cocaine with respect to sensational media reporting about the extent of ATS use and hyperbolic description of the disastrous consequences of methamphetamine addiction. It has taken nearly three decades for the public to come to a superficial understanding that the deleterious effects of crack cocaine were greatly exaggerated in mass media and government statements. The monetary and human costs of our earlier misunderstandings about crack cocaine are incalculable. Today, unfortunately, much of the public information about methamphetamine has little foundation in evidence. Overblown worst-case anecdotes are usually disseminated uncritically by the popular press and accepted as sound evidence by an undiscerning public.

Recent implementation of laws and policies aimed at curtailing methamphetamine use in several countries, including the United States, are based on less than accurate assumptions. For example, major themes in anti-methamphetamine advertisements are that the drug is instantly addictive and that use of methamphetamine leads to extreme tooth decay. There is no evidence to support either of these myths. Another common lore is that illicit methamphetamine use leads to neuroanatomical pathologies that cause cognitive impairments. This supposition is also not supported by evidence.

These campaigns have reached the point where they undermine themselves perhaps because methamphetamine users and their acquaintances know that the information is unfounded in all but the rarest cases, as happened for decades with public education materials that suggested that marijuana was a direct route to harmful addiction to hard drugs.

There is an urgent need to revisit policies and information programs related to methamphetamines both nationally and with respect to international norms. In particular:

- Countries that apply harsh criminal sanctions to methamphetamine use and possession should urgently revisit those laws and policies. There is no empirical evidence that suggests that even long-term users of methamphetamines pose a threat to those around them. Nor is there evidence to suggest that methamphetamine users should be incarcerated in order to deal with the "threat" they pose.

- Growing evidence suggests that treatment and harm reduction measures in the health sector may be helpful for some persons who are methamphetamine-dependent, though science and best practices are evolving. Specialized health services and social support informed as much as possible by the best science, rather than criminal sanctions, should be the dominant response to methamphetamine addiction in national policy. Cognitive-behavioral therapies should not be denied to people who need them based on the flawed idea that methamphetamine users are too cognitively compromised to benefit from these interventions.

There is an urgent need for national authorities and donors to invest in development of affordable, accessible and scientifically appropriate health and social services in this area.

- National regulatory authorities and the World Health Organization should restudy the costs and benefits of suppressing access to amphetamine used for legitimate medical purposes in the name of methamphetamine control. Blanket bans on amphetamine for all purposes are unjustified and may have high costs in terms of disease burden in the population. Moreover, these restrictions provide the impetus for the illicit proliferation of "meth labs," which pose hazards to public safety.

- Precursor control may hold some promise for short-term supply reduction of methamphetamine, but is unlikely to be effective beyond the short run. Like eradication of coca in the Andes, precursor markets made illicit are likely to manifest a "balloon effect" whereby they may be shut down in the short term in one location, but they will pop up quickly in another location. As suggested by the expert Global Commission on Drug Policy (2011) based on evaluation of decades of supply-control efforts in many parts of the world, it is unlikely that illicit precursor markets will be controlled in the long term without some level of state regulation that eschews criminal sanctions.

- National and international institutions and civil society organizations should stop supporting wasteful and ineffective campaigns of misinformation on methamphetamine that use exaggerations and fabricated data as scare tactics. These campaigns are not effective, and their dishonesty renders them counter-productive. There is an urgent need for correcting misinformation on methamphetamine in formats that both policy-makers and the public can understand and use.

- Where injection of methamphetamines is prevalent, access to sterile injection equipment for all who need it must be a policy and program priority. Needle and syringe programs continue to be undermined by paraphernalia laws in many countries and by tolerance of disruption of these services by the police. Denial of the reality of drug injection in prisons and refusal to provide sterile injecting equipment in prisons and other detention facilities undermine HIV and hepatitis control in many countries (Lines et al. 2005). Investment in ensuring access to sterile injection equipment remains a lagging element of national and international HIV programs in spite of decades of evidence demonstrating the effectiveness of these programs.

**Cited Literature**

Armstrong EG (2007). Moral panic over meth. *Contemporary Justice Review* 10(4):427-442.

Boyd S and Carter CI (2010). Methamphetamine discourse: media, law and policy. *Canadian Journal of Communication* 35:219-237.

Butterfield F (2004) Home Drug-Making Laboratories Expose Children to Toxic Fallout. New York Times, February 23, 2004. http://www.nytimes.com/2004/02/23/us/home-drug-making-laboratories-expose-children-to-toxic-fallout.html?pagewanted=all&src=pm

Cadet JL, Krasnova IN (2009). Molecular bases of methamphetamine-induced neurodegeneration. *International Review of Neurobiology 88:* 101-119.

Caldwell JA, Caldwell JL (2005) Fatigue in military aviation: an overview of US military-approved pharmacological countermeasures. *Aviation Space and Environmental Medicine* 76 (7 Suppl): C39-51.

Cohen T (2012). Tories use majority to pass omnibus crime bill. *National Post*, 12 March. At: http://news.nationalpost.com/2012/03/12/contentious-tory-crime-bill-passes-as-countrys-biggest-provinces-voice-concerns-over-costs/.

Colfax G, Santos, G-M, Chu P et al. (2010). Amphetamine-group substances and HIV. *Lancet* 376:458-474.

Degenhardt L, Mathers B, Guarinieri M et al. (2010). Meth/amphetamine use and associated HIV: implications for global policy and public health. *International Journal of Drug Policy* 21:347-358.

Degenhardt L, Mathers B, Guarinieri M et al. (2007). The global epidemiology of methamphetamine injection: a review of the evidence on use and association with HIV and other harm. Sydney: National Drug and Alcohol Research Centre, University of New South Wales.

Dobkin C and Nicosia N (2009). The war on drugs: methamphetamine, public health and crime. *American Economic Review* 99(1):324-349.

Eccles R (2007) Substitution of phenylephrine for pseudoephedrine as a nasal decongeststant. An illogical way to control methamphetamine abuse. Br J Clin Pharmacol. 63:10-14

Franco C (2005). Methamphetamine: legislation and issues in the 109th Congress. Congressional Research Service Report for Congress (order code RS22325). At:

Gonzales R, Mooney L and Rawson RA (2010). The methamphetamine problem in the United States. *Annual Review of Public Health* 31:385-398.

Hart CL, Haney M, Foltin RW, Fischman MW (2000) Alternative reinforcers differentially modify cocaine self-administration by humans. *Behavioural Pharmacology* 11, 87-91.

Hart CL, Marvin CB, Silver R, Smith EE (2012) Is cognitive functioning impaired in methamphetamine users? A critical review. *Neuropsychopharmacology* 37, 586-608.

Jenkins P (1994). "The ice age": the social construction of a drug panic. *Justice Quarterly* 11(1):7-31.

Kirkpatrick MG, Gunderson EW, Johanson CE, Levin FR, Foltin RW, Hart CL (2012) Comparison of intranasal methamphetamine and *d*-amphetamine self-administration by humans. *Addiction* 107, 783-91.

Lee NK, Rawson RA (2008) A systematic review of cognitive and behavioural therapies for methamphetamine dependence. Drug Alcohol Review 27: 309-17.

Leonard L, DeRubeis E, Pelude L (2008). “I inject less as I have easier access to pipes”: injecting and sharing of crack-smoking materials decline as safer crack-smoking resources are distributed. *International Journal of Drug Policy* 19(3):255-264.

Lines R, Jürgens R, Betteridge G, Stöver H (2005). Taking action to reduce injecting drug-related harms in prisons: the evidence of effectiveness of prison needle exchange in six countries. *International Journal of Prison Health* 1:49–64.

Maxwell JC and Rutkowski BA (2008). The prevalence of methamphetamine and amphetamine abuse in North America: a review of the indicators, 1992-2007. *Drug and Alcohol Review* 27:229-235.

McKetin R, Kozel N, Douglas, J et al. (2008). the rise of methamphetamine in Southeast and East Asia. *Drug and alcohol Review* 27:220-228.

Mravčík V, Škařupová K, Orlíková B et al. (2011). Use of gelatine capsules for application of methamphetamine: a new harm reduction approach. *International Journal of Drug Policy* 22:172-173.

National Public Radio (NPR) (2010) This is your face on meth, kids. http://www.npr.org/templates/story/story.php?storyId=122872005 (accessed 17 February 2013)

O'Brien MS, Anthony JC (2009) Extra-medical stimulant dependence among recent initiates. Drug and Alcohol Dependence 104: 147-55

Pearshouse R (2009). Compulsory drug treatment in Thailand: observations on the Narcotic Addict Rehabilitation Act B.W. 2545 (2002). Toronto: Canadian HIV/AIDS Legal Network. At: http://www.aidslaw.ca/publications/interfaces/downloadFile.php?ref=1429

Senate Communications Division (1999) Senator Asks Governor to Apologize for Racial Comments, Dickerson Calls Keating Statements Inappropriate, Offensive. 12 November. www.oksenate.gov/news/press_releases/press_releases_1999/PR991112.html (accessed 17 February 2013).

Simon SL, Richardson K, Dacey J, Glynn S, Domier CP, Rawson RA, Ling W (2002). A comparison of patterns of methamphetamine and cocaine use. *J Addict Dis* 21: 35-44.

South African Community Epidemiology Network on Drug Use (SACENDU) (2012). Research Brief vol. 15(1), Medical Research Council, Cape Town. At: http://www.sahealthinfo.org/admodule/sacendu/SACENDUBriefJune2012.pdf

Substance Abuse and Mental Health Services Administration (SAMHSA: 2012). *Results from the 2011 National Survey on Drug Use and Health: Summary of National Findings*, NSDUH Series H-44, HHS Publication No. (SMA) 12-4713. Rockville, MD: Substance Abuse and Mental Health Services Administration.

Thompson PM, Hayashi KM, Simon SL, Geaga JA, Hong MS, Sui Y, Lee JY, Toga AW, Ling W, London ED (2004). Structural Abnormalities in the Brains of Human Subjects Who Use Methamphetamine. *Journal of Neuroscience* 24: 6028-6036

UN Office on Drugs and Crime (2013). *World drug report 2013*. Vienna: United Nations. At: http://www.unodc.org/unodc/secured/wdr/wdr2013/World_Drug_Report_2013.pdf

U.S. Department of Justice (2011) National Drug Intelligence Center. National Drug Threat Assessment 2011 Product No. 2011-Q0317-001

United States Sentencing Commission (USSC). (1995, 1997, 2002, 2007). *Report to Congress: Cocaine and federal sentencing policy*. Washington, D.C.: United States Sentencing Commission.

Wattanaa W, van Griensvenb F, Rhucharoenpornpanicha O et al. (2007). Respondent-driven sampling to assess characteristics and estimate the number of injection drug users in Bangkok, Thailand. *Drug and Alcohol Dependence* 90:228-233.

Wechsberg WM, Jones HE, Zule WA et al. (2010). Methamphetamine ("tik") use and its association with condom use among out-of-school females in Cape Town, South Africa. *American Journal of Drug and Alcohol Abuse* 36(4):208-213.

Weidner RR (2009). Methamphetamine in three small Midwestern cities: evidence of a moral panic. *Journal of Psychoactive Drugs* 41(3):227-239.

Wodak A and Cooney A (2004). Effectiveness of sterile needle and syringe programming in reducing HIV/AIDS among injecting drug users (Evidence for Action Technical Paper). Geneva: World Health Organization. At: http://www.unodc.org/documents/hiv-aids/EFA%20effectiveness%20sterile%20needle.pdf

Zábranský T (2007). Methamphetamine in the Czech Republic. *Journal of Drug Issues* 37(1): 155-180.

Zernike K (2005) A Drug Scourge Creates Its Own Form of Orphan. New York Times, July 11, 2005.
http://www.nytimes.com/2005/07/11/national/11meth.html?pagewanted=1&_r=0&sq=methamphetamine%20scourge&st=cse&scp=1

# Exhibit 2

No. CR 12-4040-MWB
United States District Court, N.D. Iowa, Western Division.

# United States v. Hayes

948 F. Supp. 2d 1009 (N.D. Iowa 2013)
Decided Jun 7, 2013

No. CR 12–4040–MWB.

2013-06-7

UNITED STATES of America, Plaintiff, v. Willie HAYES, Defendant.

Robert A. Knief, U.S. Attorney's Office, Sioux City, IA, for Plaintiff. Jay Elliott Denne, Munger, Reinschmidt & Denne, Sioux City, IA, for Defendant.

---

MARK W. BENNETT

1010*1010

Robert A. Knief, U.S. Attorney's Office, Sioux City, IA, for Plaintiff. Jay Elliott Denne, Munger, Reinschmidt & Denne, Sioux City, IA, for Defendant.

## SENTENCING OPINION AND STATEMENT OF REASONS PURSUANT TO 18 U.S.C. § 3553(c) EXPLAINING A POLICY DISAGREEMENT WITH THE METHAMPHETAMINE GUIDELINES

**MARK W. BENNETT, District Judge.**

**TABLE OF CONTENTS**

**I. INTRODUCTION** 1011

**A.** Indictment, Guilty Plea, And Sentencing Hearing 1011

**B.** Arguments Of The Parties 1011

**II. ILLEGAL ANALYSIS** 1012

**A.** Sentencing Methodology 1012

**B.** Policy Disagreement With The Methamphetamine Guidelines 1014

**1.** Background on policy disagreement based variances 1014

**2.** Flaws in the methamphetamine Guidelines 1018

**a.** Creation of methamphetamine Guidelines 1018

**i.** The Sentencing Commission's institutional role 1018

**ii.** The methamphetamine Guidelines are not based on empirical data 1022

**b.** The methamphetamine Guidelines are excessive 1027

**c.** The methamphetamine Guidelines ranges are not heartlands 1029

**C.** Application 1031

**III. CONCLUSION** 1033

**IV. APPENDIX** 1033

1011 This case raises the question of the merits of the United States Sentencing Guidelines [1] range, pursuant to U.S.S.G. § 2D1.1, for defendants convicted of methamphetamine offenses. In my nineteen years on the federal bench, I have sent over 3,500 people to prison, the majority of whom are drug offenders. Methamphetamine is the primary drug type involved in drug-trafficking offenses in the Northern District of Iowa. In 2011, methamphetamine offenses made up 18.1% of the drug trafficking offenses across the country. Booker Report, Part C: Drug Trafficking Offenses, Methamphetamine, at 1. That same year, methamphetamine offenses made up 72.3% of the drug trafficking offenses in the Northern District of Iowa. *Id.* at 2. *1011

[1] I refer to the United States Sentencing Commission as the "Commission" and the United States Sentencing Guidelines as the "Guidelines" throughout this opinion.

This Sentencing Memorandum supplements findings made on the record at defendant Willie Hayes's sentencing hearing on June 3, 2013.

# *I. INTRODUCTION*

## *A. Indictment, Guilty Plea, And Sentencing Hearing*

On March 21, 2012, an Indictment was returned against Hayes, with the charge that he did knowingly and unlawfully combine, conspire, confederate, and agree, with others whose identities are both known and unknown to the Grand Jury, to knowingly, intentionally, and unlawfully possess with the intent to distribute 5 grams or more actual (pure) methamphetamine or 50 grams of a methamphetamine mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance within 1,000 feet of Irving Elementary School, located in Sioux City, Woodbury County, Iowa, in violation of 21 U.S.C. §§ 846(a)(1), 841(b)(1)(B), 860, and 846. On January 30, 2013, Hayes pled guilty before U.S. Magistrate Judge Leonard T. Strand to Count 1 of the four-count superseding indictment, pursuant to a plea agreement (docket no. 76). Count 1 charged Conspiracy to Possess with the Intent to Distribute 35 Grams or More of Methamphetamine Actual, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). On that same day, I accepted Hayes's guilty plea. A probation officer then prepared a presentence report ("PSR"). The PSR found that Hayes was a Career Offender because of two predicate felony convictions. On May 23, 2013, Hayes filed a Motion For Downward Departure

And Variance (docket no. 92) and a well-drafted Sentencing Brief (docket no. 93) in which he raised several issues, including a cutting-edge issue on the methamphetamine Guidelines. For reasons only known to the prosecution, the government chose not to file a written resistance to Hayes's Motion.

At the sentencing hearing, Hayes moved for a downward departure and variance. He argued that there was an over-representation of criminal history, and asked that I decline to qualify the reckless use of firearm with bodily injury (PSR ¶ ¶ 20, 26) and the burglary offense (PSR ¶ 34) as predicate offenses. Next, Hayes argued that the application of the Career Offender enhancement overstates the seriousness of Hayes's criminal record, his risk of reoffending, and his culpability in relation to his federal offense. Hayes contended that the use of methamphetamine weight overstates the seriousness of Hayes's offense and his risk of reoffending. The prosecution made a motion for downward departure based on substantial assistance under U.S.S.G. § 5K1.1. After oral arguments and Hayes's allocution, I sentenced Hayes. This opinion explains and amplifies one of the rationales for my sentence. Many issues were covered at the sentencing hearing, but this opinion is limited to the issue of the methamphetamine Guidelines.

## *B. Arguments Of The Parties*

Hayes requests that I vary down from the applicable Guidelines range, based on the factors of 18 U.S.C. §
1012 3553(a) and *1012 policy disagreements with U.S.S.G. § 2D1.1(c)(5), because U.S.S.G. § 2D1.1(c)(5) yields an excessive sentence. Hayes argues that I should not rely on U.S.S.G. § 2D1.1(c)(5) and the PSR's weight of 38.1 grams of actual methamphetamine to determine Hayes's Guidelines sentence because the Commission strayed from its institutional role in crafting § 2D1.1(c)(5) and the Guidelines fail to promote the sentencing goals of 18 U.S.C. § 3553(a). Hayes examines the increase in Guidelines ranges for methamphetamine offenses over time, highlighting the manner in which the Commission drifted from its institutional role. Hayes asserts that his Guidelines range would have been 46–57 months in 1987 and it has increased roughly 360 % to his current Guidelines range of 168–210 months. Defendant's Brief at 28. Hayes, in an especially well-crafted brief, argues that the methamphetamine Guidelines should be given less deference than Guidelines that were properly crafted with empirical data and institutional expertise. Next, Hayes asserts that the methamphetamine Guidelines fail to promote the goals of sentencing in 18 U.S.C. § 3553(a) because they have a strong potential to overstate the seriousness of a defendant's record and risk of reoffending, resulting in unwarranted sentencing disparities.

I viewed the prosecution's failure to file a resistance to Hayes's Motion For Downward Departure And Variance (docket no. 92) as a waiver to argument on the methamphetamine Guidelines issue. *See* N.D. IA. L.R. Rule 7(f) ("If no timely resistance to a motion is filed, the motion may be granted without notice. If a party does not intend to resist a motion, the party is encouraged to file a statement indicating the motion will not be resisted."). However, I still allowed the prosecution to present arguments at the sentencing hearing. I considered the prosecution's arguments, none of which were remotely persuasive, and I determined that the prosecution's position did not undermine the powerful rationale articulated by Judge Gleeson in *United States v. Ysidro Diaz,* No. 11–CR–00821–2 (JG), 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013).

# *II. LEGAL ANALYSIS*

## *A. Sentencing Methodology*

Following the Supreme Court's decision in *Gall v. United States,* the Eighth Circuit Court of Appeals has repeatedly stated the methodology for determining a defendant's sentence as follows:

The district court should begin "by correctly calculating the applicable Guidelines range." "[T]he Guidelines should be the starting point and the initial benchmark[, but] [t]he Guidelines are not the only consideration [.]" The district judge should allow "both parties an opportunity to argue for whatever sentence they deem appropriate," and then should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."
*United States v. Hill,* 552 F.3d 686, 691 (8th Cir.2009) (quoting *Gall v. United States,* 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)) (internal citations omitted); *United States v. Roberson,* 517 F.3d 990, 993 (8th Cir.2008); *see also United States v. Feemster,* 572 F.3d 455, 461–62 (8th Cir.2009) ( *en banc* ).

The Supreme Court has recognized that a party's argument for a sentence outside the calculated Guidelines range may "take either of two forms." *Rita v. United States,* 551 U.S. 338, 344, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). A party may "argue *within the Guidelines' framework,* for a departure," *id.* (emphasis in original), or a party may "argue that, independent of the Guidelines, application of the factors set forth in 18 U.S.C. §
1013 3553(a) warrants a *1013 [different] sentence." [2] *Id.* The Eighth Circuit Court of Appeals has made clear that, while "similar factors may justify either a variance or a traditional departure," *United States v. Woods,* 670 F.3d 883, 888 (8th Cir.2012), district courts are not limited by the Guidelines' departure policy framework when determining whether and by what extent to vary, *see United States v. Chase,* 560 F.3d 828, 832 (8th Cir.2009); *United States v. VandeBrake,* 679 F.3d 1030, 1037 (8th Cir.2012); *see also United States v. Villareal–Amarillas,* 562 F.3d 892, 898 (8th Cir.2009) ("The judge is cabined, but also liberated, by the § 3553(a) factors.").[3]

2 As the Eighth Circuit Court of Appeals has explained:

" 'Departure' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." *Irizarry v. United States,* 553 U.S. 708, 128 S.Ct. 2198, 171 L.Ed.2d 28 (2008). A variance, on the other hand, is a "non-Guidelines sentence[ ] based on the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Solis–Bermudez,* 501 F.3d 882, 884 (8th Cir.2007).

*United States v. Mireles,* 617 F.3d 1009, 1012 n. 2 (8th Cir.2010).

3 *See Irizarry,* 553 U.S. at 714–15, 128 S.Ct. 2198 ("[T]here is no longer a limit comparable to [a departure] on the variances from Guidelines ranges that a district court may find justified under the sentencing factors set forth in 18 U.S.C. § 3553(a).").

As a matter of procedure, the Eighth Circuit Court of Appeals has instructed that district courts should "continue to engage in the three-step process of first ascertaining the applicable Guidelines range, then considering any permissible departures within the Guidelines' structure, and finally, deciding whether a non-Guidelines sentence would be more appropriate under the circumstances pursuant to § 3553(a)." *See United States v. Washington,* 515 F.3d 861, 866 (8th Cir.2008).

Although "a court of appeals may apply a presumption of reasonableness when conducting substantive review of a sentence within the advisory range, 'the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.' " *United States v. Henson,* 550 F.3d 739, 740 (8th Cir.2008) (quoting *Rita,* 551 U.S. at 351, 127 S.Ct. 2456). The Supreme Court has emphasized this point, noting "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is

reasonable," and that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States,* 555 U.S. 350, 129 S.Ct. 890, 892, 172 L.Ed.2d 719 (2009) ( *per curiam* ) (emphasis in the original).

As the Eighth Circuit Court of Appeals has also explained, "[w]e may not require " 'extraordinary' circumstances to justify a sentence outside the Guidelines." *Feemster,* 572 F.3d at 462 (quoting *Gall,* 552 U.S. at 47, 128 S.Ct. 586). Instead, the district court:

must "make an individualized assessment based on the facts presented." [*Gall,* 552 U.S. at 50, 128 S.Ct. 586.] If the court concludes that a sentence outside of the Guidelines range is warranted, then it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* "[A] major departure should be supported by a more significant justification than a minor one." *Id.* After the district court determines the "appropriate sentence," it must then "adequately explain the chosen
1014 sentence to allow for meaningful*1014 appellate review and to promote the perception of fair sentencing." *Id.* *Feemster,* 572 F.3d at 461.

At sentencing, my first step was to determine the advisory Guidelines range for Hayes. Second, I determined whether any traditional (non-substantial assistance) departures, either upward or downward, were warranted. Third, I considered whether to vary from the advisory Guidelines range based on my independent obligation to apply the 18 U.S.C. § 3553(a) factors, including any policy disagreements. I recognized that I may not rely on the 18 U.S.C. § 3553(a) factors sentencing factors to impose a sentence below the mandatory minimum required by statute, even when the prosecution has filed and I grant a substantial assistance motion under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). *See United States v. Madison,* 585 F.3d 412, 413 (8th Cir.2009). However, in cases like this one, where the Guidelines range exceeds the mandatory minimum, I may first consider the 18 U.S.C. § 3553(a) factors to reduce a defendant's sentence. Depending on the strength of the 18 U.S.C. § 3553(a) factors, this may include down to, but not below, the mandatory minimum. *See United States v. Coyle,* 506 F.3d 680, 683 (8th Cir.2007). Then, if I grant the prosecution's motion for downward departure, I may go below the mandatory minimum, but only by applying the U.S.S.G. factors contained in § 5K1.1. Finally, I decided the prosecution's motion for downward departure based on Hayes's substantial assistance.

## *B. Policy Disagreement With The Methamphetamine Guidelines*

In this section, I discuss my policy disagreement with the Guidelines range for methamphetamine offenses.

### *1. Background on policy disagreement based variances*

Sentencing judges may impose sentences that vary from the Guidelines range based on a policy disagreement with the Guidelines. *See, e.g., Spears v. United States,* 555 U.S. 261, 263–67, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009) ( *per curiam* ); *Kimbrough v. United States,* 552 U.S. 85, 109–10, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). The Supreme Court held in *Kimbrough* that the Anti–Drug Abuse Act of 1986 "does not require ... sentencing courts ... to adhere to the 100–to–1 ratio for crack cocaine quantitates other than those that trigger the statutory mandatory minimum sentences." In discussing grounds for a variance from the Guidelines "[i]n *Kimbrough,* the Supreme Court held that it was not an abuse of discretion for a district court to vary from the Guidelines based on its policy disagreement concerning the disparity between crack and powder cocaine sentences." *United States v. Battiest,* 553 F.3d 1132, 1137 (8th Cir.2009) (citing *Kimbrough,* 552 U.S. at 110–111, 128 S.Ct. 558). Thus, "policy disagreements" may provide the basis for a variance from a Guidelines sentence, even in a "mine-run" case. *Kimbrough,* 552 U.S. at 109–110, 128 S.Ct. 558.

The Supreme Court clarified the issue of the district court's authority to vary from Guidelines sentences in *Spears,* which also involved the disparity between crack and powder cocaine sentences. In *Spears,* the Court explained that "a guideline may be rejected on categorical, policy grounds, even in a mine-run case, and not simply based on an individualized determination that it yields an excessive sentence in a particular case." *United States v. Beiermann,* 599 F.Supp.2d 1087 (N.D.Iowa 2009) (citing *Spears,* 555 U.S. at 262, 129 S.Ct. 1015 840).*1015

The powerful implication of *Spears* is that, in other 'mine-run' situations, the sentencing court may also reject Guidelines provisions on categorical, policy grounds—particularly when those Guidelines provisions "do not exemplify the Commission's exercise of its characteristic institutional role," *id.* (quoting *Kimbrough,* 552 U.S. at 89, 128 S.Ct. 558)—and may, consequently, adopt some other well-reasoned basis for sentencing. A number of federal courts of appeals have held that *Kimbrough* and *Spears* apply to policy disagreements with Guidelines other than those applicable to crack cocaine. *See, e.g., United States v. Henderson,* 649 F.3d 955, 963 (9th Cir.2011) (holding "district courts may vary from the child pornography Guidelines, § 2G2.2, based on a policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case."); *United States v. Grober,* 624 F.3d 592, 599–600 (3rd Cir.2010) (holding that while sentencing court has authority to vary from advisory Guidelines range based on its policy disagreement, when it does so it must provide "a reasoned, coherent, and sufficiently compelling explanation of the basis for [its] disagreement.") (quoting *United States v. Merced,* 603 F.3d 203, 220 (3d Cir.2010) (internal quotation marks omitted); *United States v. Corner,* 598 F.3d 411, 415 (7th Cir.2010) ( *en banc* ) ("We understand *Kimbrough* and *Spears* to mean that district judges are at liberty to reject any Guidelines on policy grounds—though they must act reasonably when using that power."); *United States v. Cavera,* 550 F.3d 180, 191 (2d Cir.2008) (en banc) ("As the Supreme Court strongly suggested in *Kimbrough,* a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses."); *United States v. Rodriguez,* 527 F.3d 221, 227 (1st Cir.2008) ("[*Kimbrough* ] makes plain that a sentencing court can deviate from the Guidelines based on general policy considerations.").

For the reasons discussed below, I join the few federal judges who have expressed a disagreement with the methamphetamine Guidelines. Judge Bataillon of the District of Nebraska has recognized the flaws in the methamphetamine Guidelines in a series of opinions. *See, e.g., United States v. Goodman,* 556 F.Supp.2d 1002, 1016 (D.Neb.2008) (varying downward in a conspiracy to manufacture methamphetamine case and holding that "[a] variance is appropriate in view of the fact that the Guidelines at issue were developed pursuant to statutory directive and not based on empirical evidence."); In *United States v. Hubel,* 625 F.Supp.2d 845, 853 (2008), Judge Bataillon analyzes the flawed creation of the methamphetamine Guidelines:

For policy reasons, and to conform to statutory mandatory minimum sentences, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for drug offenses. *Kimbrough,* 552 U.S. at 96, 128 S.Ct. at 567; Fifteen–Year Assessment at 15, 72–73. Instead, the Commission attempted "to accommodate and, to the extent possible, rationalize mandatory minimum provisions established by the 1986 Anti–Drug Abuse Act" by anchoring the Guidelines to the mandatory minimum sentences. United States Sentencing Commission, Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System (August 1991), accessed at *www. ussc. gov/ reports. htm* (hereinafter, "Mand.Min.Rep't"), Summary at ii; Rep't at 17 n.58.

1016 The Commission thus adopted "the 1986 [Anti–Drug–Abuse] Act's weight-driven scheme." *1016 *Kimbrough,* 552 U.S. at 96, 128 S.Ct. at 567; *see Chapman v. U.S.,* 500 U.S. 453, 461, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (stating that the Anti–Drug Abuse Act of 1986 provided for mandatory minimum sentences based on the weight of various controlled substances according to a "market-oriented" approach, creating a penalty scheme intended to punish large-volume drug traffickers severely). "The 1986 Act uses the weight of the drugs involved in the offense as the sole proxy to identify 'major' and 'serious' dealers." [1] *Kimbrough,* 128 S.Ct. at 567. The resulting Guidelines ranges for drug trafficking offenses are driven by the quantity of drugs, and keyed to statutory mandatory minimum sentences based on weight. *Gall,* 128 S.Ct. at 594 & n. 2; *Neal v. United States,* 516 U.S. 284, 291–92, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996) (noting that in spite of "incongruities between the Guidelines and the mandatory sentencing statute," the Commission developed Guidelines to parallel the mandatory minimum sentences set out in 21 U.S.C. § 841(b)(1), using the quantities and sentences derived from the statute and "[t]he weight ranges reflect the Commission's assessment of equivalent culpability among defendants who traffic in different types of drugs ...").

1 Although both the mandatory minimum statutes and the Guidelines calibrate punishment of drug traffickers according to quantity, the Supreme Court has acknowledged that mandatory minimum sentences are both structurally and functionally at odds with sentencing guidelines and the goals the Guidelines seek to achieve, noting that "the guidelines produce a system of finely calibrated sentences with proportional increases whereas the mandatory minimums result in 'cliffs.' " *Neal,* 516 U.S. at 291, 116 S.Ct. 763 (1996). Nonetheless, the Supreme Court has continued to affirm the scheme, leaving it to Congress to correct its disparities. *Id.; United States v. LaBonte,* 520 U.S. 751, 764, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997).

Noting that larger drug dealers were subject to a mandatory minimum of ten years for a first offense and twenty years for a subsequent conviction for the same offense, the Sentencing Commission stated that "[the Act] sought to cover mid-level players in the drug distribution chain by providing a mandatory minimum penalty of five years." *Id.* at 10. Later, in "[p]erhaps the most far-reaching provision of the Omnibus Anti–Drug Abuse Act of 1988," Congress made the mandatory minimum penalties that were previously applicable to substantive distribution and importation/exportation offenses apply also to conspiracies to commit those substantive offenses, increasing "the potential that the applicable penalties could apply equally to the major dealer and the mid- or low-level participant." *Id.* at 10.

*United States v. Hubel,* 625 F.Supp.2d 845, 849–51 (D.Neb.2008). In support of his under-the-guidelines sentence, Judge Bataillon discusses the problems with the methamphetamine Guidelines' approach:

The court has considered the Sentencing Guidelines, but, because they were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would to empirically-grounded Guidelines. *See Kimbrough,* 552 U.S. at 107–10, 128 S.Ct. at 574–75. The Guidelines' quantity-driven, "market-oriented" approach is not a proxy for culpability in every case, nor does it always correlate to the purposes of sentencing under 18 U.S.C. § 3553(a). Drug quantity is only an accurate measure when it corresponds to a defendant's position in the typical hierarchy that characterizes most drug conspiracies. Where the defendant falls in this hierarchy is an important factor in
1017 the court's assessment of a defendant's ultimate culpability.*1017 Although the quantity-based system was designed to punish bigger distributors more harshly, charging practices and the government's control over the number and amount of controlled buys from undercover or cooperating agents can result in an erroneous impression that a long-term, small-quantity distributor is a large-quantity distributor.

*Id.* at 853. This position is consistent with Judge Bataillon's long-standing disagreement with the methamphetamine Guidelines on policy grounds. *See United States v. Woody,* 2010 WL 2884918, *10 (D.Neb. July 20, 2010) (affording less deference to the methamphetamine Guidelines range since it was "promulgated

pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise" and varying downward where quantity does not accurately reflect culpability); *United States v. Ortega,* 2010 WL 1994870 (D.Neb. May 17, 2010) (recognizing the "guidelines for methamphetamine crimes were anchored to mandatory minimum sentences, not based on empirical study" and finding an outside-the-guidelines sentence necessary to reflect defendant's minor role in a methamphetamine conspiracy and to avoid unwarranted sentencing disparity); *United States v. Nincehelser,* 2009 WL 872441 (D.Neb. Mar. 30, 2009) (sentencing below the Guidelines because the "the drug offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise" and concluding that the quantity-based approach is "not always a trustworthy measure of the culpability of an individual defendant"); *United States v. Castellanos,* 2008 WL 5423858 (D.Neb. December 29, 2008) (granting defendant's motion for downward departure and concluding that the methamphetamine Guidelines should be afforded less deference since they are not empirically-grounded); *United States v. Rocha,* 2008 WL 2949242 (D.Neb.2008) (finding that the methamphetamine Guidelines are not empirically-grounded and granting defendant's downward variance in a conspiracy to distribute and possess with intent to distribute methamphetamine mixture case); *United States v. McCormick,* 2008 WL 268441, at *10 (D.Neb. Jan. 29, 2008) (varying downward after finding that "[t]he Guidelines ranges of imprisonment for possession of precursor chemicals were, like the drug-trafficking Guidelines, determined with reference to statutory directives and not grounded in empirical data").

Other courts have held that a district court judge may disagree with the methamphetamine Guidelines on policy grounds. *See, e.g., United States v. Valdez,* 268 Fed.Appx. 293 (5th Cir.2008) (affirming an upward variance based on purity of crystal methamphetamine and holding that "the district court judge can disagree with the Guidelines' policy that purity is indicative of role or that purity is adequately provided for in [defendant's] base level."); *United States v. Santillanes,* 274 Fed.Appx. 718, 718–19 (10th Cir.2008) (remanding for sentencing after prosecution conceded that it was error for the district court to conclude it did not have the power to accept defendant's argument based on a policy disagreement with the methamphetamine Guidelines).

Beyond methamphetamine, other courts have disagreed with the drug-trafficking Guidelines on the same grounds with different types of drugs. *See, e.g., United States v. Ysidro Diaz,* No. 11–CR–00821–2 (JG), 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013) (expressing a policy disagreement with the Guidelines for heroin, cocaine, and crack offenses); ( *United States v. Cabrera,* 567 F.Supp.2d 271 (D.Mass.2008) (varying downward and rejecting the cocaine guideline on the basis of "the over-emphasis on quantity and the under-emphasis on
1018 role in *1018 the offense"). In *Diaz,* Judge Gleeson thoughtfully critiqued the drug-trafficking guidelines, providing a comprehensive policy disagreement with the Guidelines for heroin, cocaine, and crack offenses that also applies to methamphetamine offenses. *Diaz,* 2013 WL 322243. He discussed the flawed creation of the drug Guidelines and how they are not based on empirical data and national experience. *Id.* at *3–7. Judge Gleeson described the overly punitive weight-driven regime. *Id.* at *7. He analyzed the pattern of sentencing to conclude that the drug-trafficking offenses have never been heartlands. *Id.* *8–9. Judge Gleeson discussed the relationship between the drug Guidelines and the problem of mass incarceration. *Id.* at *10–11 ("Perhaps the best indication that the Guidelines ranges for drug trafficking offenses are excessively severe is the dramatic impact they have had on the federal prison population *despite* the fact that judges so frequently sentence well below them."). Judge Gleeson recommended that the Commission de-link the Guidelines from the ADAA in order to revise the drug tracking Guidelines to better reflect a defendant's true culpability. *Id.* at *11–18. Until systematic changes can be made, Gleeson recommended "lower[ing] the ranges in drug trafficking cases by a third." *Id.* at *18. Judge Gleeson's cogent analysis provides valuable insight into the flawed drug-trafficking Guidelines.

## 2. *Flaws in the methamphetamine Guidelines*

This section describes the flaws in the methamphetamine Guidelines, which support my policy disagreement.

### *a. Creation of methamphetamine Guidelines*

### *i. The Sentencing Commission's institutional role*

The Sentencing Reform Act of 1984 ("SRA"), a chapter of the Comprehensive Crime Control Act of 1984, Pub.L. 98–473, 98 Stat. 2068, created the Sentencing Commission.[4] *See Dorsey v. United States,* ––– U.S. ––––, 132 S.Ct. 2321, 2326, 183 L.Ed.2d 250 (2012); *Southern Union Co. v. United States,* ––– U.S. ––––, 132 S.Ct. 2344, 2358, 183 L.Ed.2d 318 (2012). The Commission was directed to promulgate sentencing Guidelines to take effect on November 1, 1987. 18 U.S.C. § 3551 (1987). The Commission was instructed to reconcile the multiple purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2), to provide certainty and fairness, to avoid unwarranted sentencing disparities, to seek proportionality, and to reflect advancement of knowledge of human behavior. Pub.L. No. 98–473, §§ 217(a), 239, 98 Stat. 1987 (1984); 28 U.S.C. § 991(b)(1). Congress directed the Commission to ascertain data on the average sentences imposed for particular categories of cases prior to creation of the Commission, but specifically noted that the Commission "shall not be bound by such average sentences, and shall independently develop a sentencing range that is consistent with the purposes of sentencing." 28 U.S.C. § 994(m). Further, the SRA directed the Sentencing Commission to "develop means of measuring the degree to which the [Guidelines] are effective in meeting the purposes of sentencing," 28 U.S.C.
1019 § 991(b)(2), and was granted extensive *1019 research powers to do so.[5] 28 U.S.C. § 995(a)(12)-(16).

4 The Comprehensive Crime Control Act was a lengthy piece of legislation that revised many other aspects of the federal criminal justice system including the penalty schemes for federal drug offenders, bail reform measures, and the establishment of a crime victims fund. *See* Controlled Substances Penalties Amendments Act, Pub.L. 98–473, Tit. II, ch. V, 98 Stat. 2068 (penalty scheme revisions); the Bail Reform Act of 1984, Pub.L. 98–473, Tit. II, ch. I, 98 Stat. 1976 (bail); and Victims of Crime Act of 1984, Pub.L. 98–473, Tit. II, ch. XIV, 98 Stat. 2170 (creation of crime victims fund).

5 As Justice Breyer recognized in his concurrence in *Pepper:*

> The trial court typically better understands the individual circumstances of particular cases before it, while the Commission has comparatively greater ability to gather information, to consider a broader national picture, to compare sentences attaching to different offenses, and ultimately to write more coherent overall standards that reflect nationally uniform, not simply local, sentencing policies.

*Pepper v. United States,* ––– U.S. ––––, 131 S.Ct. 1229, 1254, 179 L.Ed.2d 196 (2011) (Breyer, J., concurring in part and concurring in the judgment).

In developing the Guidelines, the original Commissioners were unable to reconcile different philosophical perspectives to create a governing philosophy for the Guidelines. U.S. Sentencing Guidelines Manual § 1A.1.3 (1987). Justice Breyer, then Judge and original sentencing commissioner, described the process towards compromise:

> Faced, on the one hand, with those who advocated "just deserts" but could not produce a convincing, objective way to rank criminal behavior in detail, and, on the other hand, with those who advocated "deterrence" but had no convincing empirical data linking detailed and small variations in punishment to prevention of crime, the Commission reached an important compromise. It decided to base the Guidelines primarily upon typical, or

average, actual past practice.

Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest, 17 Hofstra L.Rev. 1, 7 (1988). Pre–Guidelines sentencing data was the "starting point" for the Commission's compromise. U.S. Sentencing Guidelines Manual § 1A.1.3 (1987). "The information derived provided a numerical anchor for guideline development." U.S. Sentencing Comm'n, Supplementary Report On The Initial Sentencing Guidelines And Policy Statements 22 (1987), available at http:// www. fd. org/ docs/ select–topics—– sentencing/ Supplementary– Report. pdf [hereinafter Supplementary Report]. According to Justice Breyer, the Sentencing Commission developed the first set of Guidelines through an empirical approach, examining 10,000 presentence reports, and determining average sentences imposed before the Guidelines, *Rita,* 551 U.S. at 349, 127 S.Ct. 2456, and that, as directed in 28 U.S.C. § 994(p), the Sentencing Commission could revise the Guidelines thereafter by studying federal court decisions and seeking advice from prosecutors, law enforcement personnel, defense counsel, civil liberties groups, and experts. [6] *Id.* at 350, 127 S.Ct. 2456. "The result is a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice." *Id.;* see U.S. Sentencing Comm'n, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 72–73 (2004) [Hereinafter Fifteen–Year Assessment]. The Court has repeatedly praised the empirical process by which the Guidelines were written. *See, e.g., Kimbrough* 552 U.S. at 108–09, 109–110, 128 S.Ct. 558;*United States v. Booker,* 543 U.S. 220, 252–56, 264–65, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); *Gall v. United States,* 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) ("[The Guidelines are] the product of careful study based on extensive 1020 empirical evidence derived from the review of thousands of individual sentencing*1020 decisions."). The Commission relied on past sentencing statistics to establish the offense levels for each type of crime. Fifteen–Year Assessment 14.

[6] As the Court explained in *Kimbrough,* one of the Sentencing Commission's institutional strengths is its capacity to base "determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough,* 552 U.S. at 109, 128 S.Ct. 558 (internal citation and quotation marks omitted).

However, the Sentencing Commission has not always followed the "characteristic institutional role" described in the SRA and by the Court in *Rita,* resulting in Guidelines that are unlikely to properly reflect 18 U.S.C. § 3553(a) considerations. *See Kimbrough,* 552 U.S. at 101–02, 128 S.Ct. 558. Swayed by policy reasons and pressure to conform to statutory minimums, the Commission did not use this empirical approach in developing the Guidelines ranges for drug-trafficking offenses. *Kimbrough,* 552 U.S. at 96, 128 S.Ct. 558;*Hubel,* 625 F.Supp.2d at 849;*Diaz,* 2013 WL 322243, at *4 (explaining that "empirical data on drug trafficking offenses were gathered, but they had *no* role in the formulation of the Guidelines ranges for drug trafficking offenses"). After Len Bias, the star University of Maryland basketball player, died of a drug overdose, on June 19, 1986, Congress swiftly enacted the Anti–Drug Abuse Act of 1986 ("ADAA" or "1986 Act"). *See Diaz,* 2013 WL 322243, at *4. The ADAA established a two-tiered system with five and ten-year mandatory minimum sentences for drug offenses, and the "Commission drafted new guidelines to accommodate these mandatory minimum provisions by anchoring the guidelines to them." Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System at ii (2011), available at http:// www. ussc. gov/ Legislative_ and_ Public_ Affairs/ Congressional_ Testimony_ and_ Reports/ Mandatory_ Minimum_ Penalties/ 20111031_ Rt C_ PDF/ Executive_ Summary. pdf [hereinafter Mandatory Minimum Report].

Even though the mandatory minimum sentences for drug-trafficking offenses in the Anti–Drug Abuse Act of 1986 ("ADAA" or "1986 Act") were much higher than the pre-guidelines sentences for the same offense, the Commission incorporated the mandatory minimum provisions of the ADAA into the Guidelines, which are based on drug type and quantity. "It jettisoned its data entirely and made the quantity-based sentences in the ADAA proportionately applicable to every drug trafficking offense." *Diaz,* 2013 WL 322243, at *6. The ADAA's "weight-driven scheme" relies on "a drug quantity table based on drug type and weight to set base offense levels for drug-trafficking offenses." Mandatory Minimum Report;*see U.S.S.G.* § 2D 1.1(c). "The resulting Guidelines ranges for drug trafficking offenses are driven by the quantity of drugs, and keyed to statutory mandatory minimum sentences based on weight." *Woody,* 2010 WL 2884918 at *5 (citing *Gall,* 128 S.Ct. at 594 n. 2;*Neal v. United States,* 516 U.S. 284, 291–92, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996)). According to the legislative history, the two-tiered penalty structure of the ADAA was intended to punish "discrete categories of drug traffickers," such as drug kingpins and organizers. Mandatory Minimum Report 24. During floor debate, Senate Minority Leader Robert Byrd explained the intent of the scheme:

For the kingpins—the masterminds who are really running these operations—and they can be identified by the amount of drugs with which they are involved—we require a jail term upon conviction. If it is their first conviction, the minimum term is 10 years.... Our proposal would also provide mandatory minimum penalties to the middle-level dealers as well. Those criminals would also have to serve time in jail. The minimum sentences would be slightly less than those for the kingpins, but they nevertheless would have to go to jail—a minimum of 5 years for the first offense.

1021 *1021 U.S. Sentencing Comm'n, Special Report to Congress: Cocaine and Federal Sentencing Policy 119 (Feb. 1995) (citing 132 Cong. Rec. S. 14,300 (Sept. 30, 1986)). Yet, the severe sentences mandated by the ADAA are triggered by weight "as the sole proxy to identify 'major' and 'serious' dealers, ignoring the role of the offender." *Kimbrough,* 552 U.S. at 95, 128 S.Ct. 558.

There is certainly reason to question the Commission's empirical process, and the Commission's efforts in crafting the drug-trafficking Guidelines have been subject to methodological criticism. Regarding the Commission's methodology, the Supplementary Report lacks complete information and contains inconsistencies. Bernard E. Harcourt, *From The Ne'er–Do–Well To The Criminal History Category: The Refinement Of The Actuarial Model In Criminal Law,* 66 L. & Contemp. Probs. 99, 123–25 (2003) ("[The Commission's] actual methodology is somewhat mysterious; the methodological appendix to the sentencing guidelines does not meet social science standards and seems almost deliberately intended to obfuscate discussion of the methods used." *Id.* at 123. Also, the Commission's data did not provide a complete picture for the Commissioners because analysis of the length of sentences did not reveal all the influential factors involved in the sentencing decision. *See* Carissa Byrne Hessick, *Appellate Review of Sentencing Policy Decisions After Kimbrough,* 93 Marq. L. Rev.. 717, 728 n.64 (2009) (noting that Justice Breyer acknowledged the Commission's uncertainty as to how a sentencing judge would weigh various factors). Also, the data was skewed because the Commission excluded sentences of probation in its analysis, which constituted about half of the pre-Guidelines sentences. *See, e.g.,* Marc L. Miller, *Domination & Dissatisfaction: Prosecutors as Sentencers,* 56 Stan. L. Rev.. 1211, 1222 (2004) ("Before the guidelines, almost 50% of federal sentences were to straight probation. Under the initial guidelines, that figure dropped to around 15 %.").

The original Commission failed to explain why it applied the "quantity-based" approach of the ADAA mandatory minimums to every drug trafficking sentence. Fifteen–Year Assessment. In 2004, the Commission acknowledged that "documents published at the time of guideline promulgation do not discuss why the [original] Commission extended the ADAA's quantity-based approach in this way." *Id.* Although the

Commission researched past sentencing practices, the "data was skewed, and at times, ignored." Judge Nancy Gertner, *From Omnipotence to Impotence: American Judges and Sentencing,*4 Ohio St. J. Crim. 523, 534 (2007). The legislative history on the Commission's development of the Guidelines is sparse. *Id.* at 535. In his dissent in *Spears,* Judge Bye quoted the Commission's 2002 report to underscore the haste in which the ADAA passed through Congress:

"Congress bypassed much of its usual deliberative process" when it passed the Anti–Drug Abuse Act of 1986 "[b]ecause of the heightened concern and national sense of urgency surrounding drugs generally and crack cocaine specifically[.]" 2002 Report at 5. "As a result, there were no committee hearings and no Senate or House Reports accompanying the bill that ultimately passed.... Thus, the legislative history for the bill that was enacted into law is limited primarily to statements made by senators and representatives during floor debates." *Id.* at 5–6.

*United States v. Spears,* 469 F.3d 1166, 1182 (8th Cir.2006) (Bye, J., dissenting), rev'd 555 U.S. 261, 129 S.Ct. 1022 840, 172 L.Ed.2d 596 (2009) ( *per curiam* ). In his dissenting opinion in *Mistretta v. U.S.,* *1022 Justice Scalia compared the Commission to "a sort of junior-varsity Congress," suggesting that the Commission lacked expertise in penology and responded quickly to political pressure. *Id.* (quoting *Mistretta v. U.S.,* 488 U.S. 361, 427, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)). Justice Scalia's sharp critique of the Commission appears to have merit. The original Commission acknowledged, in vague terms, the influence of the ADAA:

Recent legislative direction was an important consideration and, if particularly clear, essentially superseded the current-practice analyses. Thus, the sentences for drug offenses, which reflect the recent passage of the Anti–Drug Abuse Act, are much higher than in current practice. The guidelines for drug offenses do, however, draw upon current practice to some extent.

Supplementary Report at 18. In Breyer's analysis of the Guidelines process, he described the ADAA as a "change in the law independent of the Guidelines." *Breyer, supra,* at 24 n. 121. "It is important to remember that the Guidelines consider only *past* sentencing practices, and that some federal legislation contains stricter minimum sentences [ADAA] that will increase the federal prison population significantly." *Id.* at 24. This perspective suggests the Commission did not have any control regarding the adoption of the ADAA to the Guidelines. Breyer's thorough explanation of the Commission's creation of the Guidelines lacks any discussion of the role of mandatory minimum penalty statutes or any Congressional directives related to the ADAA. *See* Paul J. Hofer, *Empirical Questions and Evidence in Rita v. United States,* 85 Denv. U.L. Rev.. 27, 47 (2007).

In *Kimbrough,* the Supreme Court found that the Guidelines' 100:1 powder/crack ratio was not based on the Sentencing Commission's empirical research, but, instead, was simply borrowed from the ratio Congress used to set minimum and maximum sentences in the ADAA. *Id.* at 95–96, 128 S.Ct. 558. In turn, the ADAA's ratio was based on Congress's mere assumptions regarding the relative dangerousness of crack. *Id.* at 95, 128 S.Ct. 558. After adopting the 100:1 ratio in the original Guidelines, the Sentencing Commission's research revealed that many of the assumptions used to justify the 100:1 ratio were baseless. *Id.* at 97–98, 128 S.Ct. 558. As a result, the Sentencing Commission attempted to amend the Guidelines to reduce the ratio to 1:1, but Congress blocked this attempt pursuant to 28 U.S.C. § 994(p), which provides that Guideline amendments become effective unless disapproved by Congress. *Id.* at 99, 128 S.Ct. 558. Given that the 100:1 ratio was expressly contrary to the Sentencing Commission's own research, the Court held that the ratio did not "exemplify the Commission's exercise of its characteristic institutional role." *Id.* at 109, 128 S.Ct. 558. As with the crack cocaine Guidelines, the Sentencing Commission strayed from its institutional role with the methamphetamine Guidelines.

### *ii. The methamphetamine Guidelines are not based on empirical data*

The methamphetamine Guidelines have evolved through a series of amendments over the years, and the
1023 penalties for methamphetamine offenses have increased dramatically.[7] For example, with a criminal *1023
history category VI and 38.1 grams of methamphetamine actual, Hayes's base offense level is 30 and his Guidelines range is 168–210 months. As Hayes points out in his brief, his Guidelines range has increased about 360% since 1987. Defendant's Brief at 28.

7 For a comprehensive history of the methamphetamine amendments from 1988 to 2012, see Amy Baron–Evans, Promulgation and Amendment of U.S.S.G. § 2D1.1, Methamphetamine Offenses: 1998–2012, available at http:// ca 7. fd. org/ Indiana_ Southern/ Documents/ Baron– Evans–% 20Meth% 20Promulgation% 20and% 20Amendment% 20History.pdf [hereinafter Methamphetamine Offenses].

The initial sentencing Guidelines, following the mandatory minimum quantity thresholds established in the ADAA "did not list methamphetamine in the drug table because they were not subject to the 1986 Act. U.S. Sentencing Comm'n, Methamphetamine: Final Report of the Working Group 7 (1999), *available at* http:// www. ussc. gov/ Research/ Working_ Group_ Reports/ Drugs/ 199911_ Meth_ Report. pdf [hereinafter Methamphetamine Report]. When the initial Guidelines took effect on November 1, 1987, methamphetamine was listed in the "Drug Equivalency Tables" as a Schedule II stimulant with an equivalency equal to twice that of cocaine. *Id.* While the reasoning is unknown, the Commission made 1 gram of methamphetamine equal to 2 grams of cocaine. Methamphetamine Offenses, at 1. If Hayes were sentenced for the same offense in 1987, he would have a base offense level of 16 and a Guidelines range of 46–57 months. U.S. Sentencing Comm'n, Guidelines Manual 239 (1987); Defendant's Brief at 28–30.

The Anti–Drug Abuse Act of 1988 established mandatory minimums for methamphetamine trafficking offenses. Methamphetamine Report 7. The Commission incorporated the mandatory minimums to correspond the Guidelines ranges at base offense levels 26 and 32 to the triggering quantities. Methamphetamine Offenses, at 1. Pursuant to the 1988 Act, 10 grams of methamphetamine or 100 grams methamphetamine mixture triggered the 5–year minimum, and 100 grams methamphetamine or 1 kilogram methamphetamine mixture triggered the 10–year minimum. Methamphetamine Report at 7–8. Thus, there was a 10:1 quantity ratio between the 10–year and 5–year minimums. *Id.* at 8. The 1988 Act also used a 10:1 ratio for mixture to pure substance.[8] *Id.* As a result, in 1989, Hayes would have had a base offense level of 26, increasing his Guidelines range to 120–150 months. U.S.S.G. § 2D1.1(c)(9) (1989) (stating that "at least 10 g but less than 40 g of pure methamphetamine" result in a base offense level 26); Defendant's Brief at 31. In 1989, Hayes's offense would have triggered the five-year mandatory minimum.

8 For comparison, in 1989, 1 gram pure methamphetamine = 10 grams methamphetamine mixture = 10 grams heroin = 50 grams cocaine = 10 kilograms marijuana = 500 milligrams crack. *See* Amy Baron–Evans, Variance, Departures, and Deconstructing the Meth Guidelines: Current Trends and Cautionary Tales, CJA Trial Panel Annual Training (Dec. 12, 2012), at 109, *available at* http:// ca 7. fd. org/ Indiana_ Southern/ Documents/ Baron– Evans–% 20Slides.pdf.

The Crime Control Act of 1990 instructed the Commission to increase the methamphetamine Guidelines for Ice by two levels. Methamphetamine Report at 9. The Commission amended the Guidelines in 1991, making both Ice and actual methamphetamine four to eight levels higher than mixture. Methamphetamine Offenses, at 3. "[T]he Commission reasoned that it could best achieve the enhanced punishment purpose of the instruction in a manner consistent with the Guidelines' structure by treating Ice, a form of methamphetamine that typically was 80 to 90 percent pure, as if it were 100 percent pure methamphetamine." Methamphetamine Report at 9.

In 1991, the Commission amended the Drug Equivalency Tables to simplify the Guidelines calculations for
1024 when multiple drugs are involved by expressing the equivalences for all controlled substances *1024 in terms of weights of marijuana. *Id.* at 10 (Amend. 396). As a result, 1 gram of methamphetamine mixture was equated to 1 kilogram of marijuana and 1 gram of actual methamphetamine was equated to 10 kilograms of marijuana. *Id.*

In the Comprehensive Methamphetamine Control Act of 1996, Congress instructed the Commission to amend the Guidelines by increasing the punishment for methamphetamine trafficking offenses. *Id.* The Commission added a two-level enhancement if the defendant knew the chemicals were imported unlawfully, a two-level enhancement for an environmental offense, and it cut the quantity in half for methamphetamine mixture. *Id.* at 11. "As a result, the quantity of methamphetamine mixture needed to trigger a Guidelines range corresponding to the statutory mandatory minimum sentences was 50 grams for five years (compared to 100 grams under the statute) and 500 grams for ten years (compared to 1000 grams in the statute)." Methamphetamine Offenses, at 6. The ratio between mixtures to actual methamphetamine changed from 10:1 to 5:1. Methamphetamine Report at 11.

In the Methamphetamine Trafficking Penalty Enhancement Act of 1998, Congress cut the quantities of both methamphetamine mixture and actual methamphetamine necessary to trigger the five and ten year mandatory minimums. *Id.* at 12. "As a result, offenses involving 5 grams of methamphetamine (actual) are assigned a base offense level 26, and offenses involving 50 grams of methamphetamine (actual) are assigned a base offense level 32." Methamphetamine Offenses, at 10. Therefore, after October 21, 1998, the five-year mandatory minimum is triggered by 5 grams of methamphetamine or 50 grams of methamphetamine, and the ten-year mandatory minimum is triggered by 50 grams of methamphetamine mixture or 500 grams of methamphetamine mixture. Methamphetamine Report at 12. Equal treatment of methamphetamine actual and crack was "an overt objective noted and apparently sought by some sponsors of the legislation." *Id.*

The current Guidelines distinguish between two forms of methamphetamine powder: actual and mixture. There are two methods for determining a defendant's base offense level in methamphetamine powder cases, either by the weight of the actual methamphetamine contained within a mixture or by the weight of the entire mixture containing a detectable amount of methamphetamine. U.S.S.G. § 2D1.1(c).[9] According to the Guidelines' drug quantity table, base offense levels for methamphetamine offenses range from 12, for offenses involving less than 2.5 grams of methamphetamine, or less than 250 MG of methamphetamine (actual) or less than 250 MG
1025 of "Ice"; to level 38, involving offenses of *1025 15 kilograms or more of methamphetamine, or 1.5 kilograms or more of methamphetamine (actual), or 1.5 KG or more of "Ice." U.S.S.G. § 2D1.1(c). The Guidelines reflect a ratio of ten to one between the penalties for distribution of a mixture as compared to distribution of the pure form. U.S.S.G. § 2D1.1(c). The quantities in the Guidelines table correspond to the mandatory minimum provisions applicable to methamphetamine offenses. *Woody,* 2010 WL 2884918, at *5;*compare* 21U.S.C. §§ 841(b)(1)(A)(viii) & 841(b)(1)(B)(viii)*with*U.S.S.G. § 2D1.1(c)(4) & (7). 50 grams of methamphetamine triggers a mandatory minimum of 10 years with a maximum of life imprisonment. 21 U.S.C. § 841(1)(A)(viii). 5 grams of more of methamphetamine triggers a mandatory minimum of 5 years with a maximum of 40 years imprisonment. 21 U.S.C. § 841(1)(B)(viii). "The Commission has used the sentences provided in, and equivalences derived from, the statute ( 21 U.S.C. § 841(b)(1)), as the primary basis for the guidelines sentences." U.S.S.G. § 2D1.1, comment., 8(A).

9 As explained in the Mandatory Minimum Report:

Methamphetamine exists in two identifiable forms: (1) as a powder, soluble in water or alcohol; and (2) in crystalline form. The latter, commonly referred to as Ice, is the variant used for smoking the substance. As a powder, the drug is injected, swallowed, or snorted. The Drug Quantity Table specifically references Ice and methamphetamine;

> distinguishing the latter for sentencing purposes between the pure drug (meth-actual) and a mixture of the drug with adulterants (meth-mix). Methamphetamine-actual and -mix are not different forms of the substance but rather are alternative methods of measuring the severity of the offense both under the mandatory minimum statutes and the guidelines. In a given methamphetamine case (other than Ice), the applicable penalty is the greater of that for the weight of the methamphetamine-mixture, or the amount of actual/pure methamphetamine contained in the mixture, as determined by expert laboratory analysis.
>
> Mandatory Minimum Report at 14 n.40.

In 2010, a mandatory minimum penalty applied in 83.1% of methamphetamine cases, the highest rate of any drug type. Mandatory Minimum Report at 153. For methamphetamine cases carrying a mandatory minimum, more than half (58%) of the offenders received relief from a mandatory minimum at sentencing. *Id.* at 227. About one quarter of those methamphetamine offenders (26.8%) received relief from the safety valve. *Id.* For providing substantial assistance to the prosecution, 21.2% of the methamphetamine offenders received relief from the mandatory minimum penalty. 10% of methamphetamine offenders received relief from both the safety valve and substantial assistance motions. *Id.* For methamphetamine offenders subject to the mandatory minimum at sentencing, the average sentence length in 2011 was 144 months. *Id.* at 229. This is the highest average sentence length for any drug type. *Id.* For methamphetamine offenders who received relief from the mandatory minimum, the average sentence length was 72 months. *Id.* at 230. Less than forty percent (38.3%) of all methamphetamine offenders subject to a mandatory minimum in 2011 received a sentence within the Guidelines range. *Id.* at 231.

"No other drug is punished *more* severely based on purity." Amy Baron–Evans, Deconstructing the Meth Guidelines, Presentation for the Sentencing Resource Counsel, Federal Public and Community Defenders, at 12, available at txn.fd.org/Meth.pps. The Commission assumed that offenses involving actual methamphetamine are more severe than offenses involving mixtures of methamphetamine. The Commission reasoned: "Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G. § 2D1.1., cmt. n.26(c). While it may seem logical to punish a pure substance more than mixed substance, there is no support in the legislative history to explain the formula underlying greater methamphetamine purity to greater months of imprisonment. *See* Amy Baron–Evans, Deconstructing the Meth Guidelines, Presentation for the Sentencing Resource Counsel, Federal Public and Community Defenders, at 12, available at txn.fd.org/Meth.pps. This issue is heightened when the offender was merely a courier or mule who has no knowledge of the purity of the methamphetamine he or she is transporting. In an exchange in *United States v. Santillanes,* the court recognized 1026 the unwarranted disparity created by the methamphetamine Guidelines:*1026

**AUSA:** But the Sentencing Commission has evolved its calculation of the guidelines based upon the evolution of whatever information was available to them.

**The Court:** Which may or may not be politics.

**AUSA:** Right, sir.... I don't know that it has any scientific basis. All I know, Your Honor, it's been looked at over time and has changed and evolved, which would imply that there was been—it could have been political, but it would certainly imply that somebody has looked at something ...

**The Court:** I find that there is no empirical data or study to suggest that actual purity should be punished more severely by an arbitrary increase of the four levels in this case or at the higher level. It seems to be black box science, as best I can determine. I probably would not allow it under *Daubert,* based on what I know at present. It seems to be contrary to any empirical evidence, and really undermines Section 3553(a), as it does create an unwarranted disparity. It seems to me that this is not even a rough approximation to comply with 3553, and is not really based on any consultation or criminal justice goals or data.
Jennifer Niles Coffin, *Where Procedure Meets Substance: Making the Most of the Need for Adequate Explanation in Federal Sentencing,*Champion, Mar. 2012, at 36 (quoting Transcript of Sentencing Hearing, *United States v. Santillanes,* No. 07–619 (D.N.M. Sept. 19, 2009), available on PACER at https:// ecf. mmd. uscourts. gov/ doc 1/ 12111917143). With its focus on quantity, the Guidelines' system "was designed to punish bigger distributors more harshly, but that result cannot be achieved when the presumptive purity assigned under the Guidelines' scheme does not correlate to the actual purity of the drug being distributed and does not reflect the reality of the market for that drug." *Ortega,* 2010 WL 1994870, at *7.

In *United States v. Newhouse,* 919 F.Supp.2d 955 (N.D.Iowa.2013), I questioned whether there is a factual or logical basis for a relatively low amount of methamphetamine to trigger a five-year mandatory minimum:

Compared to methamphetamine, marijuana, once stripped from the plant, takes 20,000 times greater quantity (100,000 grams) to trigger a five-year mandatory minimum. Compared to methamphetamine, powder cocaine takes 100 times greater quantity (500 grams) to trigger a five-year mandatory minimum. Compared to methamphetamine, heroin takes twenty times greater quantity (100 grams) to trigger a five-year mandatory minimum. Compared to methamphetamine, crack, after the passage of the Fair Sentencing Act, now takes nearly six times greater quantity (28 grams) to trigger a five-year mandatory minimum. *See*21 U.S.C. § 841. *Newhouse,* 919 F.Supp.2d at 962-63 n. 9, 2013 WL 346432, at *6 n. 9. In light of research revealing the assumptions behind the crack/powder disparity, it is important to examine the underlying assumptions of the methamphetamine Guidelines. *United States v. Gully,* 619 F.Supp.2d 633 (N.D.Iowa 2009) (discussing how the origin of the crack/powder cocaine disparity was based on Congress's overblown fears of a crack epidemic and assumptions about the relative harmfulness of crack cocaine and powder cocaine, not supported by proper research and data). Table A, as set forth in the Appendix, illustrates a comparison of Guidelines ranges for different drug types, using Hayes's drug quantity as a starting point. The level of harmfulness is difficult to measure and many drug abuse experts contend that methamphetamine is not the most harmful drug. *See* Amy
1027 Baron–Evans,*1027 Variance, Departures, and Deconstructing the Meth Guidelines: Current Trends and Cautionary Tales, CJA Trial Panel Annual Training (Dec. 12, 2012), at 119, *available at* http:// ca 7. fd. org/ Indiana_ Southern/ Documents/ Baron– Evans–% 20Slides.pdf. For example, a study by David J. Nutt and colleagues consistently ranks alcohol, heroin, and crack cocaine as more harmful than methamphetamine. David J. Nutt et al, Drug Harms in the UK: a multicriteria decision analysis, 376 The Lancet 1558 (2010). "For legislative purposes, drugs have mostly been classified according to their addictive potency. Such classifications, however, lack a scientific basis." Jan van Amsterdam et al, *Ranking the Harm of Alcohol, Tobacco and Illicit Drugs for the Individual and the Population,* 16 Eur. Addiction ResearchH 202, 202–204 (2010) (ranking the mean harm scores of crack cocaine, heroin, tobacco, and alcohol higher than methamphetamine).

This review of the history of the methamphetamine Guidelines illustrates how the Guidelines were crafted by Congressional directive and not precise analysis and empirical research. "A district court's authority to vary from the applicable Guidelines range due to a policy disagreement is at its greatest when the offense Guidelines at issue are not the product of the Commission's empirical analysis and technical expertise." *Diaz,* 2013 WL

322243, at *3. Thus, the methamphetamine Guidelines are entitled to less deference than those Guidelines that were based on the Commission's exercise of institutional expertise and empirical analysis. *See Woody,* 2010 WL 2884918, at *10 (acknowledging that "the drug offense Guidelines ... were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise" and "afford[ing] them less deference than it would empirically-grounded Guidelines.").

## *b. The methamphetamine Guidelines are excessive*

The methamphetamine offense Guidelines are excessive because they subject all defendants to harsh treatment, regardless of their role in the offense. "The Commission's lineage of the Guidelines ranges for drug trafficking offenses to the ADAA's weight-driven regime has resulted in a significantly more punitive sentencing grid than Congress intended in passing the ADAA." *Diaz,* 2013 WL 322243, at *6. This problem of the current drug trafficking regime, "in which offenders of widely differing culpability receive unreasonably similar sentences," has been called "excessive uniformity." Eric L. Sevigny, Excessive Uniformity in Federal Drug Sentencing, 25 J. Quant. Criminol.. 155, 156 (2009). "Excessive uniformity in drug sentencing has its genesis in guideline-based rules of sentencing, including an overemphasis on drug quantity, the 'relevant conduct' standard, and the narrow scope and applicability of culpability-based sentencing adjustments." *Id.* The original Commission focused on quantity since "the amount of drugs was more easily quantifiable than role in the offense and, it was thought, quantity would serve as a good proxy for role." *Id.* "[D]rug quantity is sometimes a plausible surrogate for an offender's dangerousness, culpability or level of organizational responsibility. At best it is a crude surrogate." Stephen J. Schulhofer, *Assessing the Federal Sentencing Process: The Problem is Uniformity, Not Disparity,* 29 Am. Crim. L. Rev. 833, 851–73 (1992). Changes in the drug trade have resulted in larger drug
1028 quantities, making the large quantity indicator of responsibility ineffective. *Id.* *1028

Quantity is a particularly poor proxy for defendants who played a minor role in the drug trade. In *United States v. Nincehelser,* the defendant was a "small player," since her "role was to purchase precursor chemicals." *Nincehelser* at *6. Judge Bataillon observed that "in view of her attenuated role in the conspiracy, this is one of the cases in which the quantity determination does not serve as a reliable proxy for culpability." *Id.* In *Hubel,* a case involving "an addict recruited by her manipulative boyfriend to act as a go-between in drug transactions," Judge Bataillon discussed his concerns with the Guidelines system:

The Guidelines' quantity-driven, "market-oriented" approach is not a proxy for culpability in every case, nor does it always correlate to the purposes of sentencing under 18 U.S.C. § 3553(a). Drug quantity is only an accurate measure when it corresponds to a defendant's position in the typical hierarchy that characterizes most drug conspiracies. Where the defendant falls in this hierarchy is an important factor in the court's assessment of a defendant's ultimate culpability. Although the quantity-based system was designed to punish bigger distributors more harshly, charging practices and the government's control over the number and amount of controlled buys from undercover agents can result in an erroneous impression that a long-term, small-quantity distributor is a large-quantity distributor.

*Hubel,* 625 F.Supp.2d at 853. Similarly, Judge Gertner recognized the same flaw in the Guidelines in *United States v. Cabrera,* 567 F.Supp.2d 271, 273 (D.Mass.2008), where the defendant, a mere deliveryman in a cocaine scheme, "was caught—quite literally—holding the bag." 567 F.Supp.2d 271, 272 (D.Mass.2008). Judge Gertner described Cabrera as a "classic case of false uniformity":

False uniformity occurs when we treat equally individuals who are not remotely equal because we permit a single consideration, like drug quantity, to mask other important factors. Drug quantity under the Guidelines treats as similar the drug dealers who stood to gain a substantial profit, here the purchaser who escaped, and the deliveryman, Cabrera, who received little more than piecework wages.

*Id.* at 273 (varying downward and rejecting the cocaine Guidelines on the basis of "the over-emphasis on quantity and the under-emphasis on role in the offense"). Judge Gertner identifies two fundamental problems with the Guidelines system: "the overemphasis on quantity and the under emphasis on role in the offense." *Id.* at 275.

The methamphetamine Guidelines range is overinclusive, because it subjects all defendants to harsh treatment, not just the managers and leaders of the drug enterprise. The Commission's analysis of a 15–percent sample of fiscal year 2009 drug cases indicates that the mandatory minimum penalties for drug offenses have a wider reach than Congress intended:

The majority of offenders in nearly every function, including low-level Secondary and Miscellaneous functions, were convicted of an offense carrying a mandatory minimum penalty, although higher level functions tended to be convicted of such statutes at higher rates. The Commission's analysis found that, for every function, the quantity of drugs involved in the offense resulted in a base offense level that included or exceed the five-year mandatory minimum penalty. Furthermore, the Commissions' analysis revealed that the quantity of drugs involved in an offense was not closely related to the offender's function in the offense. Mandatory Minimum Report.

1029 The Commission organizes offenders on a continuum of decreasing culpability:*1029

• High–Level Supplier/Importer: Imports or supplies large quantities of drugs (one kilogram or more); is near the top of the distribution chain; has ownership interest in the drugs; usually supplies drugs to other drug distributors and generally does not deal in retail amounts.

• Organizer/Leader: Organizes or leads a drug distribution organization; has the largest share of the profits; possesses the most decision-making authority.

• Grower/Manufacturer: Cultivates or manufactures a controlled substance and is the principal owner of the drugs.

• Wholesaler: Sells more than retail/user-level quantities (more than one ounce) in a single transaction, purchases two or more ounces in a single transaction, or possesses two ounces or more on a single occasion, or sells any amount to another dealer for resale.

• Manager/Supervisor: Takes instruction from higher-level individual and manages a significant portion of drug business or supervises at least one other coparticipant but has limited authority.

• Street–Level Dealer: Distributes retail quantities (less than one ounce) directly to users.

• Broker/Steerer: Arranges for drug sales by directing potential buyers to potential sellers.

• Courier: Transports or carries drugs using a vehicle or other equipment.

• Mule: Transports or carries drugs internally or on his or her person.

Mandatory Minimum Report at 166–67. More than half of the methamphetamine offenders in every role category were subject to a mandatory minimum. *Id.* The majority of defendants in methamphetamine offenses are neither managers nor leaders. *See*U.S. Sentencing Comm'n, 2012 Sourcebook Of Federal Sentencing Statistics Table 40 (2012) (providing data that shows approximately 93.8% of methamphetamine defendants sentenced in 2012 were not leaders). However, the Guidelines ranges for methamphetamine offenses are triggered by quantity, so all offenders, whether they are managers or not, receive an elevated penalty as long as

the offense meets the threshold quantity of methamphetamine. The vast majority of offenders are subjected to the harsh sentencing system that Congress intended for only the leaders. The leaders receive an escalated sentence.

The methamphetamine Guidelines are fundamentally flawed because they fail to consider additional factors beyond quantity. The system is too severe in the indiscriminate way it treats offenders. Efforts by Congress and the Commission to mitigate the severity of the Guidelines "commendable in sprit, amount to gnats around the ankles of the elephant." *Diaz,* 2013 WL 322243, at *7. Since the methamphetamine Guidelines are fundamentally flawed, I find that they fail to promote the purposes of sentencing under 18 U.S.C. § 3553(a).

### *c. The methamphetamine Guidelines ranges are not heartlands*

In the original Sentencing Guidelines Manual of 1987, the Commission described the role of the Guidelines:

The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

1030*1030 U.S. Sentencing Guidelines Manual § 1.6 (1987). The Commission explained its policy for departures, predicting that departures would be rare because "the guidelines, offense by offense, seek to take account of those factors that the Commission's sentencings data indicate make a significant difference in sentencing at the present time." *Id.* at 1.7.

Despite the Commission's intention to make each guideline a heartland, sentencing data over the years reveal that the Guidelines range for methamphetamine offenses do not constitute the typical case or heartland. "The Guidelines ranges are not now, and have never been, the 'heartlands' the Commission sought to establish." *Diaz,* 2013 WL 322243, at *9. According to the Commission's national data for drug-trafficking offenses in 2012, 42.9% of the sentences were within the Guidelines range, 0.9% were above, and 56.3% were below. U.S. Sentencing Comm'n, 2012 Sourcebook of Federal Sentencing Statistics, Table 27A. Of the sentences below the guidelines range, 37% were government sponsored and 19.3% were non-government sponsored. *Id.* "Aggravating circumstances occur just as frequently as mitigating ones, so if the Commission had gotten it right, the number of sentences below the applicable range would be at least roughly equal to the number of above-range sentences." *Diaz,* 2013 WL 322243, at *8. This pattern indicates that the Guidelines range for methamphetamine offenses is not typical and needs to be adjusted. *See id.* Sentences below the Guidelines are not an exception, but the standard. During the post-*Gall* period, from December 11, 2007 to September 30, 2010, the average extent of reduction below the bottom of the Guidelines range for methamphetamine drug trafficking offenses was 29% or 30 months. Judge Patti B. Saris, Chair, U.S. Sentencing Comm'n, Prepared Testimony Before the Subcommittee on Crime, Terrorism, and Homeland Security, Committee on the Judiciary, United States House of Representatives (Oct. 12, 2011), at 41, available at http:// www. ussc. gov/ Legislative_ and_ Public_ Affairs/ Congressional_Testimony_and_ Reports/Testimony/20111012_Saris_Testimony.pdf.

The Court in *Kimbrough* explained that "a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the "heartland" to which the Commission intends individual Guidelines to apply.' " 552 U.S. at 109, 128 S.Ct. 558 (quoting *Rita,* 551 U.S. at 351, 127 S.Ct. 2456). Here, the heartland itself is flawed. The high number of downward departures indicates that the Guidelines range is not a heartland or typical case. It is not surprising, considering the Guidelines range for drug-trafficking offenses is not based on empirical data of past sentencing practices.

In the first Guidelines Manual, the Commission described the Guidelines as an evolving system that the Commission would shape over time. U.S. Sentencing Guidelines Manual § 1.4 (1987) ("these initial guidelines are but the first step in an evolutionary process"). Part of the Commission's mission is to "periodically review and revise, in consideration of comments and data coming to its attention, the guidelines." 28 U.S.C. § 994( *o*). The statutory mission in the current U.S. Sentencing Guidelines Manual advises that the "guidelines-writing process [is] evolutionary" and expects "that continuing research, experience, and analysis will result in modifications and revisions to the Guidelines through submission of amendments to Congress." U.S. Sentencing Guidelines Manual § 1.A.2 (2012). Despite statistics illustrating the ill-fitting methamphetamine
1031 offense Guidelines, the Commission has not followed through on its commitment*1031 to continually revise the Guidelines in light of such experience and data.

## *C. Application*

The Guidelines were intended to be evolutionary in nature, and policy disagreements provide a valuable function in the process of constantly improving them. As Judge Gleeson observed, "These policy disagreements are healthy." *Diaz,* 2013 WL 322243, at *16.

A variance based on a policy disagreement is particularly appropriate for methamphetamine offenses because the Guidelines range results in sentences greater than necessary to achieve sentencing objectives and the Guidelines are not based on empirical data and national experience. *See Kimbrough,* 552 U.S. at 96, 128 S.Ct. 558 ("The Commission did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses."); *Gall,* 552 U.S. at 46 n. 2, 128 S.Ct. 586 ("[T]he Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes.").

I agree with Judge Gleeson's analysis of the flaws in the Guidelines range for drug-trafficking offenses, as it pertains to methamphetamine offenses, which constitute the majority of drug-trafficking offenses in the Northern District of Iowa. Therefore, I will follow Judge Gleeson's recommendation of reducing the penalty by one third for methamphetamine offenses in response to the fundamental problems with the methamphetamine Guidelines range. *See Spears,* 555 U.S. at 266, 129 S.Ct. 840 (explaining that once the sentencing court varies from the Guidelines based on a categorical policy disagreement, it has the authority to adopt a well-reasoned basis for sentencing). This one third reduction is a good starting point and a reasonable way to express my policy disagreement with the Guidelines. However, lowering the Guidelines range by one third only recognizes the flaws in the Guidelines system, but it does not address the underlying problems with the current system. Therefore, after reducing the Guidelines range by one third to account for my policy disagreement, I will reserve the ability to adjust the figure upwards and downwards as I weigh the 18 U.S.C. § 3553(a) factors. This includes whether the base offense level, the weight of the drugs the defendant is held accountable for, is an accurate proxy for defendant's culpability. *See*18 U.S.C. § 3553(a)(1) ("the nature and circumstances of the offense and the history and characteristics of the defendant"). This method will allow me to consider important factors the Guidelines do not contemplate. While I agree that the Guidelines range for methamphetamine offenses is deeply flawed, I take no position on how the Guidelines should be revised because it is not for me to decide.

As I have done with policy disagreements in prior cases, I will calculate the Guidelines range under the existing Guidelines, and then I will calculate an alternative Guidelines range based on a one third reduction. Next, I will either use or vary from that alternative Guidelines range depending upon my consideration of the 18 U.S.C. § 3553(a) factors. This methodology for determining a defendant's sentence is consistent with the three-step process reiterated by the Eighth Circuit Court of Appeals:

The first step in the sentencing process is to determine the proper guidelines range for the defendant's sentence. *Gall v. United States,* 552 U.S. 38, 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007); [*United States v. Thundershield,* 474 F.3d [503,] 506–07 (8th Cir.2007) ]. A court should then consider whether a departure or a
1032 variance is appropriate *1032 and apply the factors in 18 U.S.C. § 3553(a). *Gall,* 128 S.Ct. at 596–97;*Thundershield,* 474 F.3d at 506–07.
*United States v. Roberson,* 517 F.3d 990, 993 (8th Cir.2008); *see United States v. Mireles,* 617 F.3d 1009, 1012 (8th Cir.2010) ("[I]n determining an appropriate sentence, the district court ordinarily should determine first the appropriate guideline range, then decide if the guidelines permit a traditional departure, and finally determine whether the § 3553(a) factors justify a variance from this guidelines sentence.") (internal quotation marks omitted); *United States v. Rivera,* 439 F.3d 446, 447 (8th Cir.2006) ( "In *United States v. Haack,* 403 F.3d 997, 1002–03 (8th Cir.2005), we outlined the procedure a district court is to follow in imposing a post-Booker sentence. First, the district court should determine the Guidelines sentencing range. Second, the district court should determine whether any traditional departures are appropriate. Third, the district court should apply all other section 3553(a) factors in determining whether to impose a Guidelines or non-Guidelines sentence."). Although "a court of appeals may apply a presumption of reasonableness when conducting substantive review of a sentence within the advisory range, 'the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.' " *United States v. Henson,* 550 F.3d 739, 740 (8th Cir.2008) (quoting *Rita v. United States,* 551 U.S. 338, 351, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007)). The Supreme Court has emphasized this point, noting that "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," and that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States,* 555 U.S. 350, 129 S.Ct. 890, 892, 172 L.Ed.2d 719 (2009) (per curiam) (emphasis in the original).

In this case, I first calculated the defendant's advisory sentencing Guidelines range based on the current Guidelines and considered whether any adjustments or departures from that Guidelines range were appropriate. This calculation, based on the current Guidelines, resulted in an advisory Guidelines range of 188 to 235 months. There is a mandatory minimum of five years and a statutory maximum of forty years. I overruled Hayes's objection based on over-representation of criminal history. I granted Hayes's objection to the career offender enhancement, in part, which reduced his criminal history level from 31 to 29, rather than the level 27 Hayes requested. The resulting Guidelines range was 151 to 188 months. Next, I determined whether any traditional "departure" was appropriate, *see United States v. Washington,* 515 F.3d 861, 866 (8th Cir.2008). Since the only departure motion before me is the prosecution's motion for substantial assistance, I considered the substantial assistance motion after I considered whether to vary from the advisory Guidelines range. *See Coyle,* 506 F.3d at 683. Then, I considered the 18 U.S.C. § 3553(a) factors to determine what sentence was sufficient, but not greater than necessary, to serve the purposes of sentencing. 18 U.S.C. § 3553(a). In particular, I found Hayes's difficult upbringing to be mitigating, while his drug-trafficking for profit and failure to pay child support were aggravating. These factors ultimately balanced out and the only 18 U.S.C. § 3553(a) factor that influenced my sentence was my policy disagreement with the methamphetamine Guidelines. As explained above, I followed the lead of Judges Bataillon and Gleeson, adopting Judge Gleeson's method in *Diaz* to reduce the Guidelines range by one third on the basis of a policy rejection of the methamphetamine Guidelines. The calculations for this Guidelines range resulted in 100 months to 124 months. Based on my
1033 analysis*1033 of the 18 U.S.C. § 3553(a) factors, this resulted in a sentence of 100 months. Finally, I granted the prosecution's motion for substantial assistance under U.S.S.G. § 5K1.1 with a 25% reduction, resulting in a final sentence of 75 months. After analyzing these factors, I determined that a sentence of 75 months of incarceration was sufficient, but not greater than necessary.

## *III. CONCLUSION*

I find that I have the discretion to vary from the Guidelines range for methamphetamine offenses and a variance is appropriate. I am placing less weight on the Guidelines range because of my fundamental policy disagreement with the Guidelines range for methamphetamine drug-trafficking offenses. A sentence pursuant to the Guidelines range would be greater than necessary to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a). For the reasons stated above, I find that defendant Willie Hayes should be sentenced to 75 months' incarceration.

A Judgment of Conviction in accordance with this Sentencing Memorandum will issue this date.

**IT IS SO ORDERED.**

## *IV. APPENDIX*

Table A: Drug Type Comparison Base Criminal Offense History Guidelines Mandatory Drug Type Quantity Level Category Range Minimum Methamphetamine (actual) and Methamphetamine “Ice” 35 g (at least 35 g but less than 50 g) 30 VI 168–210 months 5 years (triggered at 5 g or more) Cocaine Base (Crack) 35 g (at least 28 g but less than 112 g) 26 VI 120–150 months 5 years (triggered at 28 g or more) Methamphetamine (mixture) 35 g (at least 30 g but less than 40 g) 22 VI 84–105 months (triggered at 50 g or more) Heroine 35 g (at least 20 g but less than 40 g) 18 VI 57–71 months (triggered at 100 g or more) Cocaine 35 g (at least 25 g but less than 50 g) 14 VI 37–46 months (triggered at 500 g or more) Marijuana 35 g (less than 250 g) 6 VI 12–18 months (triggered at 100 kg) Source: U.S.S.G. § 2D1.1(c).

casetext